# IN THE SUPREME COURT OF IOWA

No. 10–0214

Filed April 19, 2013

**STATE OF IOWA,**

Appellee,

vs.

**ISAAC ANDREW BALDON III,**

Appellant.

Appeal from the Iowa District Court for Scott County, Mark J. Smith, Judge.

Defendant appeals his conviction for drug dealing by challenging the search of his automobile. **REVERSED AND REMANDED FOR NEW TRIAL.**

Mark C. Smith, State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Benjamin M. Parrott, Assistant Attorney General, Michael J. Walton, County Attorney, and Kelly G. Cunningham, for appellee.

**CADY, Chief Justice.**

In this case, we must decide whether a provision in a written parole agreement that authorizes a parole officer or law enforcement officer to conduct a warrantless, suspicionless search of a parolee and the home, vehicle, and belongings of the parolee satisfies, by itself, the consent exception to the reasonableness and warrant requirements of the search and seizure clause of the Iowa Constitution. We conclude a parole agreement does not satisfy the consent exception, and we reverse the judgment and sentence of the district court. We remand the case for a new trial.

## I. Background Facts and Proceedings.

Isaac Baldon III was sentenced in 2003 to a term of incarceration with the state penal system following convictions for possession of controlled substances with intent to deliver and possession of a firearm by a felon. He was granted parole on October 20, 2008. On November 3, 2008, Baldon and his parole officer, Kevin Peterson, signed a parole agreement that contained seventeen standard conditions of parole and five special terms of parole. One standard condition, paragraph P, provided that Baldon would submit his "person, property, place of residence, vehicle, personal effects to search at any time, with or without a search warrant, warrant of arrest or reasonable cause by any parole officer or law enforcement officer." The parole order directed that Baldon would not be released on parole until he signed the agreement.

To combat recidivist probationers and parolees, the Bettendorf Police Department commonly relied on paragraph P of the standard terms of a parole agreement to conduct searches of parolees in the city. Its officers were made aware of the consent-search provision and received training in conducting parolee searches.

More specifically, Bettendorf police officers implemented a protocol to check the Traveler Motel in Bettendorf several times each day as part of a routine patrol. The motel was known by the police department as perhaps the single highest crime location in Bettendorf. The Bettendorf Police Department has made numerous arrests at the motel, a total of 110 in 2007 alone. Most of the arrestees were probationers and parolees. The arrests most frequently involved drug offenses, prostitution, gun offenses, and auto theft.

Under the search protocol for the motel, the patrolling officer checks the license plate numbers of every vehicle in the parking lot to locate parolees or probationers. If a vehicle in the lot belongs to a parolee, the officer contacts the parolee's parole officer, either to obtain consent to search the parolee or to invite the parole officer to join the police officer in a search of the parolee. Both the police department and the parole officers are accustomed to using paragraph P as a basis to search parolees, either without suspicion or suspicion based on the high-crime nature of the area. The officer then contacts the front desk attendant of the motel to ascertain whether the parolee is checked into the hotel and, if so, to obtain the room number.

At approximately 8:30 a.m. on May 25, 2009, Officer Dennis Tripp followed this protocol during his patrol of the Traveler Motel. The license plate check of a 1996 Oldsmobile showed it was registered to Baldon. Upon learning this, Officer Tripp called the shift commander, Sergeant Piazza, and asked him to contact parole officer Kevin Peterson.

Pursuant to the protocol, Sergeant Piazza informed Peterson that Baldon was at the motel. He also asked Peterson for permission to have Officer Tripp search the motel room and vehicle. Peterson gave his permission to search Baldon, but indicated he would like to be involved

in the search and would promptly meet the police officers at the motel. Tripp learned Baldon was staying in room 29.

When Peterson arrived, Officer Tripp had been joined by Sergeant Piazza and another Bettendorf police officer. The officers collectively approached room 29 and knocked on the door. Eventually, Baldon opened the door. A young woman, later revealed to be a minor, was observed sitting on the bed. Peterson greeted Baldon and explained that the parole agreement authorized the officers to conduct a search of the motel room and Baldon's vehicle.

The search of the motel room and Baldon's person yielded no incriminating evidence. Officer Tripp then took Baldon's car keys and searched Baldon's car. He discovered a large quantity of marijuana. After Tripp read Baldon his *Miranda* rights at the police station, Baldon confessed he had received the marijuana in satisfaction of a debt. The State charged Baldon with possession of a schedule I controlled substance with intent to deliver, second or subsequent offense, under Iowa Code sections 124.411 and 902.8 (2009) and possession of an amount of marijuana greater than 42.5 grams in violation of Iowa Code chapter 453B.

Baldon moved to suppress the marijuana seized from the search of his vehicle under both the Iowa and Federal Constitutions. He claimed the entry into his motel room and vehicle violated the Search and Seizure Clauses of both the Iowa and Federal Constitutions because paragraph P of the parole agreement constituted involuntary consent. The State argued the search was reasonable because Baldon consented to the searches by signing the parole agreement. It asserted Baldon was still serving his sentence while on parole and whatever expectation of privacy he may have had while on parole had been waived. At the hearing on the

suppression motion, Officer Tripp testified he conducted the search based only on the agreement. He testified there had been no complaints involving Baldon at the motel. Peterson, the parole officer, agreed the search was "completely based on [the] agreement and nothing more."

The district court denied Baldon's motion to suppress. It found Baldon consented to the search by signing the parole agreement and that the consent made the search reasonable. It also found Baldon waived any claim of privacy.

Baldon then waived his right to a trial by a jury, and the court found him guilty of the charges. Following the imposition of sentence, Baldon appealed.

## II.  Scope and Standard of Review.

"We review claims the district court failed to suppress evidence obtained in violation of the federal and state constitutions de novo." *State v. Dewitt*, 811 N.W.2d 460, 467 (Iowa 2012). When presented with such a claim, " 'we make an independent evaluation [based on] the totality of the circumstances as shown by the entire record.' " *State v. Kurth*, 813 N.W.2d 270, 272 (Iowa 2012) (quoting *State v. Krogmann*, 804 N.W.2d 518, 522–23 (Iowa 2011)). " 'Each case must be evaluated in light of its unique circumstances.' " *Id.* (quoting *Krogmann*, 804 N.W.2d at 523).

## III.  Issue Presented.

The fighting issue presented to the district court in response to the motion to suppress was whether Baldon consented to the search by signing the parole agreement. Although the State also seemed to argue more generally before the district court that suspicionless searches of parolees did not violate the Search and Seizure Clause of either the Iowa or Federal Constitution because parolees have a diminished expectation

of privacy, it never argued the State had reasonable suspicion or other reasonable grounds to conduct the search of Baldon apart from consent. While the record is sketchy, the diminished-expectation-of-privacy argument was, instead, tied to the State's consent claim to support the proposition that Baldon was aware he had little expectation of privacy after he signed the parole agreement.

On appeal, the State reiterated its claim of consent. Alternatively, however, the State argued the search was reasonable under a general search-and-seizure analysis because Baldon's minimal expectation of privacy was outweighed by the interests of society in managing parolees and preventing recidivism, as well as reasonable suspicion.

We find the State waived the general reasonableness argument by not presenting it to the district court in a manner that would have allowed the court to fully and properly address it. *See State v. Ochoa*, 792 N.W.2d 260, 291 (Iowa 2010) (recognizing that an argument not made on an issue before the district court is waived). First, the State made no argument that special governmental needs justified the search. Thus, we have no opportunity to consider in this appeal whether the State's maintenance of a parole system presents "special needs[] beyond the normal need for law enforcement, [which] make the warrant and probable-cause requirement impractical." *See New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S. Ct. 733, 748, 83 L. Ed. 2d 720, 741 (1985) (Blackmun, J., concurring); *see also Griffin v. Wisconsin*, 483 U.S. 868, 875, 107 S. Ct. 3164, 3169, 97 L. Ed. 2d 709, 718 (1987) (holding that Wisconsin's operation of a probation system constitutes a special need beyond the normal need for law enforcement).

Second, the State made no argument to the district court that a balancing test under article I, section 8 would weigh in favor of the State

in this case. For sure, the evidence at the suppression hearing was directed at Baldon's parole status and putative consent as the basis for the search. *See Ochoa*, 792 N.W.2d at 291 (holding that parole status alone is insufficient to justify search of a parolee). The State did not introduce evidence of any particular need for the parole officer to search Baldon, either predicated on individual suspicion, background information particular to Baldon that would have been known to the parole officer, or the general mission of parole. Thus, the only issue we address on appeal is whether a parole agreement containing a consent-to-search clause renders suspicionless and warrantless searches of parolees reasonable under the search and seizure clause of the Iowa Constitution.

Additionally, we only analyze the consent issue in this case on state constitutional law grounds. The United States Supreme Court has not yet directly weighed in on the issue to direct an outcome under the Fourth Amendment or to aid us in our resolution under our state constitution. *See Samson v. California*, 547 U.S. 843, 852 n.3, 126 S. Ct. 2193, 2199 n.3, 165 L. Ed. 2d 250, 259 n.3 (2006) (declining to consider whether a search provision in a parole agreement generated under California law constituted consent). Of course, it is beyond dispute that the drafters of both our federal and state constitutions took the right to be free from unreasonable, warrantless searches seriously. *See generally Ochoa*, 792 N.W.2d at 269–75 (explaining events surrounding the drafting and ratification of the Federal and Iowa Constitutions). Yet, we need not comb for textual differences between the Fourth Amendment and article I, section 8 to determine if different results might be achieved under the two constitutions because the case only concerns the relatively humble inquiry of whether an alleged grant of consent for police to

conduct warrantless, suspicionless searches pursuant to a parole agreement is voluntary in the constitutional magnitude of the word "voluntary." Thus, our decision hinges on the meaning and spirit of consent to justify the government's intrusion without regard to the constitution.

Moreover, consent is an exception to the requirements of both the Iowa and Federal Constitutions, and it would be inconsistent with our judicial role under the circumstances to eschew our state constitution and interpret the issue under the Federal Constitution unless relief would not be available to a claimant under our state constitution. As Justice William Brennan sagely declared in his call to arms for state courts:

> Federalism need not be a mean-spirited doctrine that serves only to limit the scope of human liberty. Rather, it must necessarily be furthered significantly when state courts thrust themselves into a position of prominence in the struggle to protect the people of our nation from governmental intrusions on their freedoms.

William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 503 (1977). More directly, we must remember that, at all times, "[t]he Iowa Constitution is the cornerstone of governing in Iowa." *Varnum v. Brien*, 763 N.W.2d 862, 875 (Iowa 2009).

In the final analysis, our right under principles of federalism to stand as the final word on the Iowa Constitution is settled, long-standing, and good law. *See Ochoa*, 792 N.W.2d at 281–86, 287–91 (rejecting the United States Supreme Court's interpretation of the Fourth Amendment as permitting warrantless, suspicionless searches of parolees based on parole status alone); *Bierkamp v. Rogers*, 293 N.W.2d 577, 579 (Iowa 1980) ("The result reached by the United States Supreme

Court in construing the federal constitution is persuasive, but not binding upon this court in construing analogous provisions in our state constitution."); *State v. Tonn*, 195 Iowa 94, 104–05, 191 N.W. 530, 535–36 (1923) (rejecting the exclusionary rule adopted by the United States Supreme Court for seizures of evidence by federal agents); *see also Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557, 60 S. Ct. 676, 679, 84 L. Ed. 920, 924 (1940) ("It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions."). As more fully elucidated by the concurring opinion, state constitutions have been a crucial font of equality, civil rights, and civil liberties from the incipience of our republic. Thus, the Supreme Court's jurisprudence regarding the freedom from unreasonable searches and seizures under the Fourth Amendment—or any other fundamental, civil, or human right for that matter—makes for an admirable floor, but it is certainly not a ceiling.[1] *Traylor v. State*, 596 So. 2d 957, 961–63 (Fla. 1992).

With this background in mind, we proceed with what we now recognize as the *Tonn–Ochoa* analysis.

---

[1]In the past, we did not always employ the doctrine of independent state grounds to *expand* civil liberties. In *Tonn*, for example, we said:

> We are now squarely confronted with the proposition as to whether or not we will continue to follow the Supreme Court of the United States in the rule of [*Boyd v. United States*, 116 U.S. 616, 638, 6 S. Ct. 524, 536, 29 L. Ed. 746, 753–54 (1886), and *Weeks v. United States*, 232 U.S. 383, 393, 34 S. Ct. 341, 344, 58 L. Ed. 652, 656 (1914)]. The consideration of such a proposition may well "give us pause." The question is of great importance in the administration of the criminal laws of this state.

195 Iowa at 104–05, 191 N.W. at 535. We ended up rejecting the exclusionary rule. *See id.* at 107, 191 N.W. at 536. Of course, the United States subsequently incorporated the Fourth Amendment's exclusionary rule against the states in *Mapp v. Ohio*, 367 U.S. 643, 655–57, 81 S. Ct. 1684, 1691–92, 6 L. Ed. 2d 1081, 1090–91 (1961). The incorporation doctrine commands that we no longer use independent state grounds to sink below the federal floor.

**IV. Discussion.**

It is well-settled that warrantless searches are virtually " 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' " *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043, 36 L. Ed. 2d 854, 858 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576, 585 (1967)); *accord State v. Naujoks,* 637 N.W.2d 101, 107 (Iowa 2001). One recognized exception to the warrant requirement of our constitution is consent. *State v. Reinier*, 628 N.W.2d 460, 464–65 (Iowa 2001) (citing *Schneckloth*, 412 U.S. at 219, 93 S. Ct. at 2043–44, 36 L. Ed. 2d at 858). Under this exception, the reasonableness requirement of the Search and Seizure Clause is satisfied when an individual consents to a search. *See Katz*, 389 U.S. at 358 n.22, 88 S. Ct. at 515 n.22, 19 L. Ed. 2d at 586 n.22. The consent establishes a waiver of rights under the Search and Seizure Clause. Thus, the question before us narrows to whether the parole agreement in this case establishes consent.

The nature of contracts supports the general proposition that consent to a search can be prospectively given pursuant to a contract. *See Zap v. United States*, 328 U.S. 624, 628–29, 66 S. Ct. 1277, 1279, 90 L. Ed. 1477, 1482 (1946), *judgment vacated by* 330 U.S. 800, 67 S. Ct. 857, 91 L. Ed. 2d 1259 (1947). In other words, a person can contract away the constitutional right to be free from unconstitutional searches. *See id.*

In *Zap*, an aeronautical engineer entered into a contract with the Department of the Navy to perform experimental work involving test flights of airplanes. *Id.* at 626, 66 S. Ct. at 1278, 90 L. Ed. at 1480. Under one of the terms of the contract, the engineer specifically agreed to permit the government to search the account and billing records of his

business during the term of the contract. *Id.* at 627, 66 S. Ct. at 1279, 90 L. Ed. at 1481. A subsequent search of the records by the government conducted pursuant to the contract led to fraud charges against the engineer. *Id.* at 627, 628, 66 S. Ct. at 1279, 90 L. Ed. at 1481. In the course of the prosecution of the charges, the government defended the warrantless search when challenged by the engineer on grounds that the engineer waived his Fourth Amendment rights by entering into the contract. *Id.* at 628, 66 S. Ct. at 1279, 90 L. Ed. at 1481. The Court held the search was valid on two levels: First, it found the contract constituted a valid advance waiver of his privacy rights because he agreed to permit the search "in order to obtain the government's business." *Id.* at 628, 66 S. Ct. at 1279, 90 L. Ed. at 1482. Second, the search itself was not carried out in an unreasonable manner, but was done during regular business hours and without any threats or force. *Id.*

When consent in any form is used to support a search, the concern of the Search and Seizure Clause is that the consent be real and not a "pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Schneckloth*, 412 U.S. at 228, 93 S. Ct. at 2048, 36 L. Ed. 2d at 863. Thus, our concern when presented with a search-and-seizure claim in the context of contractual consent is that the consent promised under the contract be voluntary. *Cf. id.* at 227, 93 S. Ct. at 2047–48, 36 L. Ed. 2d at 862–63.

Generally, contract terms are considered to be consensual or voluntary for the same basic reason that courts normally enforce contracts. Conceptually, courts enforce contracts because they are a product of the free will of the parties who, within limits, are permitted to define their own obligations. The consent found within a contract is

made evident by the bargain exchanged by the parties. In *Zap*, the bargained-for exchange was enough, as with most contracts, to support the consent of its terms. The engineer gave up his constitutional right to be free from warrantless and suspicionless government searches in return for obtaining government business. *Zap*, 328 U.S. at 628, 66 S. Ct. at 1279, 90 L. Ed. at 1482.

The United States Supreme Court has not addressed the specific question whether a parole agreement executed by a parolee constitutes valid consent to support a waiver of Fourth Amendment rights. *See Samson*, 547 U.S. at 852 n.3, 126 S. Ct. at 2199 n.3, 165 L. Ed. 2d at 259 n.3 ("Because we find that the search at issue here is reasonable under our general Fourth Amendment approach, we need not reach the issue whether 'acceptance of the search condition constituted consent in the *Schneckloth* . . . sense of a complete waiver of his Fourth Amendment rights.' " (quoting *United States v. Knights*, 534 U.S. 112, 118, 122 S. Ct. 587, 591, 151 L. Ed. 2d 497, 504–05 (2001))). *See generally Griffin*, 483 U.S. 868, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (holding a search of a probationer's home pursuant to a Wisconsin probation regulation was permissible under a special needs theory, but not addressing whether the probationer had consented to the search under the regulation). We too have not previously decided the question under the Iowa Constitution. *See Ochoa*, 792 N.W.2d at 291.

Many courts across the nation have concluded that consent-search provisions in probation agreements constitute a waiver of search-and-seizure rights. *See United States v. Barnett*, 415 F.3d 690, 691–92 (7th Cir. 2005) (finding consent-search provision in a probation agreement was voluntary); *State v. Montgomery*, 566 P.2d 1329, 1330–31 (Ariz. 1977) (holding probationer voluntarily accepted consent-search provision

by accepting probation); *People v. Bravo*, 738 P.2d 336, 341 (Cal. 1987) ("A probationer, unlike a parolee, consents to the waiver of his Fourth Amendment rights in exchange for the opportunity to avoid service of a state prison term."); *People v. Mason*, 488 P.2d 630, 634 (Cal. 1971) (holding probationer may waive claims to privacy by agreeing in advance to permit searches at any time); *Allen v. State*, 369 S.E.2d 909, 910 (Ga. 1988) (finding consent-search provision as part of probation was voluntarily obtained during plea negotiations); *State v. Gawron*, 736 P.2d 1295, 1297 (Idaho 1987) (holding conditional release into society of probationer decreases expectation of privacy); *State v. Devore*, 2 P.3d 153, 156 (Idaho Ct. App. 2000) (discussing a probationer's ability to prospectively consent to warrantless, suspicionless searches in the probation agreement); *People v. Absher*, 950 N.E.2d 659, 664–68 (Ill. 2011) (holding defendant contractually agreed to intensive probation to avoid prison); *Rivera v. State*, 667 N.E.2d 764, 767 (Ind. Ct. App. 1996) (holding defendant agreed to submit to searches as a condition of probation); *People v. Hellenthal*, 465 N.W.2d 329, 330 (Mich. Ct. App. 1991) ("A probationer . . . has given his consent in return for more lenient treatment." (quoting *People v. Peterson*, 233 N.W.2d 250, 257 (Mich. Ct. App. 1975) (Danhof, J., concurring in part, dissenting in part)); *State v. Anderson*, 733 N.W.2d 128, 139 (Minn. 2007) (holding acceptance of probation subject to a search condition " 'significantly diminished [Anderson's] reasonable expectation of privacy' " (quoting *Knights*, 534 U.S. at 119–20, 122 S. Ct. at 591, 151 L. Ed. 2d at 504)); *State v. Morgan*, 295 N.W.2d 285, 288–89 (Neb. 1980) (holding that consent-search provision of a probation agreement was voluntary even though defendant would have been sent to prison if he rejected it); *State v. Bollinger*, 405 A.2d 432, 438 (N.J. Super. Ct. Law Div. 1979) (holding

defendant gave "a valid and knowing consent to a search of his dwelling and automobile when he agreed [to the terms of probation]"); *State v. Mitchell*, 207 S.E.2d 263, 264 (N.C. Ct. App. 1974) (holding a person may consent to warrantless searches as a condition of a suspended sentence); *State v. Davis,* 191 S.W.3d 118, 122 (Tenn. Crim. App. 2006) ("A probationer consents to the waiver of his Fourth Amendment rights in exchange for the opportunity to avoid incarceration."); *State v. Martinez,* 811 P.2d 205, 209 (Utah Ct. App. 1991) (holding probationer prospectively consents to searches by signing probation agreement); *Anderson v. Commonwealth,* 507 S.E.2d 339, 341 (Va. 1998) (holding defendant's agreement to consent-search provision not coerced merely because it was "one of two undesirable options").

Some courts have concluded probationers do not voluntarily consent to these search provisions, however. *See United States v. Consuelo-Gonzalez,* 521 F.2d 259, 265 & n.15 (9th Cir. 1975) (rejecting an argument that the "contract theory" of parole could be applied to probationers so as to make "[s]ubmission to [to any search] the price of probation"); *Grubbs v. State,* 373 So. 2d 905, 910 (Fla. 1979) (holding condition of probation requiring probationer "to consent at any time to a warrantless search by a law enforcement officer" was unconstitutional); *Commonwealth v. LaFrance,* 525 N.E.2d 379, 381 n.3 (Mass. 1988) ("The coercive quality of the circumstance in which a defendant seeks to avoid incarceration by obtaining probation on certain conditions makes principles of voluntary waiver and consent generally inapplicable."); *Peterson,* 233 N.W.2d at 255 (characterizing a search-provision of a probation agreement as a "Bill of Attainder for the period of probation" and holding that "when the waiver [was] conditioned on the surrender of so hallowed a right, the so-called choice amount[ed] to no choice at all

[and] the probationer's signed acceptance therefore was in legal effect coerced and thus rendered nugatory" (footnote omitted)); *State v. Schlosser*, 202 N.W.2d 136, 139 (N.D. 1972) (holding search provision in probation order "constitute[d] a reasonable and necessary element of [the court's regulation of probationers,] which did not require the defendant's consent"); *Tamez v. State*, 534 S.W.2d 686, 692 (Tex. Crim. App. 1976) (holding probationer's acceptance of search provision of parole agreement did not constitute "freely and voluntarily given" consent).

On the other hand, only a handful of courts have addressed the same question in the context of parole agreements that we face in this case, with mixed results. *See United States ex rel. Coleman v. Smith*, 395 F. Supp. 1155, 1157 (W.D.N.Y. 1975) (holding consent-search provision in parole agreement was coerced and involuntary); *Roman v. State*, 570 P.2d 1235, 1241–42 (Alaska 1977) (holding released offenders do not voluntarily consent to all conditions of parole); *People v. Reyes*, 968 P.2d 445, 448 (Cal. 1998) (holding suspicionless searches of parolees cannot be justified by consent if prospective parolee does not have freedom to accept or reject parole); *People v. McCullough*, 6 P.3d 774, 781 (Colo. 2000) (avoiding consent issue by relying on the special needs doctrine to justify a parolee search); *People v. Wilson*, 885 N.E.2d 1033, 1042 (Ill. 2008) (adopting *Samson* instead of analyzing the parole agreement's search condition under a consent framework); *State v. Heaton*, 812 N.W.2d 904, 908 (Minn. Ct. App. 2012) ("By agreeing to [the search] condition of parole, appellant diminished his reasonable expectation of privacy."); *Himmage v. State*, 496 P.2d 763, 765–66 (Nev. 1972) (holding parolee voluntarily agreed to consent-search provision as a condition of release into society); *People v. Huntley*, 371 N.E.2d 794, 798 (N.Y. 1977) (holding the parolee's signature on parole agreement "is not to be taken

as an unrestricted consent to any and all searches whatsoever or as a blanket waiver of all constitutional rights to be secure from unreasonable searches and seizures"); *Sullivan v. Bunting*, 975 N.E.2d 999, 1001 (Ohio 2012) (holding parolee consented to search of his e-mail based on the parole agreement); *State v. Benton*, 695 N.E.2d 757, 762 (Ohio 1998) (holding parolee waives constitutional search-and-seizure rights by voluntarily signing parole agreement); *Scott v. Pa. Bd. of Prob. & Parole*, 698 A.2d 32, 36 (Pa. 1997) (holding parolee's right to be free from unreasonable searches and seizures was "unaffected by his signing of the consent to search provision"), *rev'd on other grounds*, 524 U.S. 357, 369, 118 S. Ct. 2014, 2022, 141 L. Ed. 2d 344, 355 (1998); *State v. Turner*, 297 S.W.3d 155, 166 (Tenn. 2009) (adopting *Samson* "where the parolee has agreed to warrantless searches by law enforcement officers"); *State v. Velasquez*, 672 P.2d 1254, 1260 & n.4 (Utah 1983) (holding defendant does not waive Fourth Amendment protection by signing parole agreement, but the search condition does confirm right of parole officer to conduct reasonable searches within scope of parole mission); *Pena v. State*, 792 P.2d 1352, 1357–58 (Wyo. 1990) ("[A] parolee's signature on a parole agreement which permits warrantless searches as an acknowledgement that parole officers have the right to conduct *reasonable* searches."); *see also State v. Williams*, 486 S.W.2d 468, 472 (Mo. 1972) ("[Parolees] have accepted the favor of parole subject to that degree of surveillance and search required under the circumstances for the effective supervision of the parolee and the protection of the public.").

To begin our analysis, we largely set aside the cases dealing with probation agreements. These cases are of limited value in analyzing the consent issue in parole agreements because probationers often end up on probation through plea bargaining and, consequently, maintain a

vastly superior bargaining power than parolees. Such a probationer has the choice of demanding a trial to seek his or her freedom, which many courts find gives rise to the type of bargaining power that renders probation agreements consensual. *See Barnett,* 415 F.3d at 692 ("Nothing is more common than an individual's consenting to a search that would otherwise violate the Fourth Amendment, thinking that he will be better off than he would be by standing on his rights."). Thus, we primarily focus on parolee cases.

More direct to the issue we must decide, our review of those cases that enforce consent provisions of a parole agreement largely undervalue the rights of parolees, rendering them inapposite for a helpful and tight analysis under Iowa law. *See Ochoa,* 792 N.W.2d at 287–91. For example, many of these cases simply follow *Samson. See, e.g., Wilson,* 885 N.E.2d at 1042 (applying *Samson* to a parole agreement with different language than the language at issue in *Samson*); *Turner,* 297 S.W.3d at 166 (holding requirement that a prisoner agree to search condition of parole "is reasonable in light of the parolee's significantly diminished privacy interests"). Like *Samson, Wilson* is not a true consent case; it simply uses a search condition in a parole agreement to decrease the parolee's expectation of privacy to a nullity. *See Wilson,* 885 N.E.2d at 1042; *see also Samson,* 547 U.S. at 852 n.3, 126 S. Ct. at 2199 n.3, 165 L. Ed. 2d at 259 n.3. Similarly, although it preceded *Samson, McCullough* was not actually a consent case either, but rather a special needs case that essentially used the special needs doctrine to reach the result reached by *Samson. See McCullough,* 6 P.3d at 780–81. Likewise, *Sullivan* did not analyze the facts of the case for anything resembling voluntariness. *See* 975 N.E.2d at 1001. Neither did its jurisprudential progenitor, *Benton. See* 695 N.E.2d at 761. Rather, *Benton* simply

concluded parolees may be subjected to suspicionless searches based on policy grounds largely related to the parolee's status. *See id.* Our rejection of *Samson* in *Ochoa* leads us to reject these cases as well. *See* 792 N.W.2d at 287–91.

Additionally, two cases pique our concern that suspicionless consent searches of parolees also impact persons who live with parolees. *See McFerrin v. State*, 42 S.W.3d 529, 534–35 (Ark. 2001) (holding parole officer could extract consent from parolee's sister prior to parolee's release); *Devore*, 2 P.3d at 156–57 & nn.1, 2 (holding a search notification form requiring parolee's roommates to submit to suspicionless searches created valid consent). Another case cogently explains the fear about these cases. *Roman*, 570 P.2d at 1241–42. The *Roman* court stated:

> "Fourth amendment protection will be diminished not only for parolees, but also for the family and friends with whom the parolee might be living. Those bystanders may find themselves subject to warrantless searches only because they are good enough to shelter the parolee, and they may therefore be less willing to help him—a sadly ironic result in a system designed to encourage reintegration into society. Moreover, the demeaning effect of arbitrary intrusions into the parolee's privacy will be reflected in the attitudes of his relatives and friends. As a result, the parolee will suffer diminished feelings of self-worth, making his rehabilitation more difficult. In addition, warrantless parole officer searches may reinforce patterns of resentment to authority, and excessive external controls may inhibit the development of necessary internal controls: 'a person must have the freedom to be responsible if he is to become responsibly free.'"

*Id.* at 1243 (quoting Note, *Striking the Balance Between Privacy and Supervision: The Fourth Amendment and Parole and Probation Searches of Parolees and Probationers*, 51 N.Y.U. L. Rev. 800, 816–17 (1976) (footnotes omitted)). *Roman* actually rejected consent as a rationale for upholding searches of parolees, although it held limited searches of

parolees were acceptable under another rationale. *See id.* at 1241–42, 1243–44. These collective observations give us pause to follow this line of authority.

Those courts in other states that have rejected consent derived from parole agreements as a theory for upholding searches of parolees do so on the basis that such a condition of parole is coercive and, therefore, involuntary. *See, e.g., Coleman,* 395 F. Supp. at 1157. These courts not only find the general surrounding circumstances tend to weigh against consent, particularly the custodial nature of the setting that produces parole, but also the limited choices available to a prisoner seeking parole. *Coleman,* 395 F. Supp. at 1157. The temptation of the "return to normalcy," combined with the fact that the parolee's choices are either to waive Fourth Amendment rights or to remain incarcerated, render the resulting agreement to waive all Fourth Amendment protection coercive and invalid. *Id.*; *cf. Tamez,* 534 S.W.2d at 692 ("The choice to reject probation and go to prison or accept probationary condition was really no choice at all. It was in effect coerced."). This approach actually resembles the path we have already begun to forge.

We have previously recognized the absence of bargaining power by a parolee in a parole agreement. In *State v. Cullison,* we rejected the notion of using contract law to support a voluntary surrender of constitutional rights by a parolee on the basis that parole involves the situation in which the State "has all of the bargaining power," which renders the contractual nature of an agreement illusory. 173 N.W.2d 533, 536–37 (Iowa 1970).[2]

---

[2]Without expressly saying so, we decided *Cullison* based on the Iowa Constitution. *Cullison,* 173 N.W.2d at 537–38. The keystone of our reasoning there was article II, section 5 of the Iowa Constitution, which strips Iowa prisoners of a single

The lack of free will by a parolee to support consent-search provisions of parole agreements was also recognized in the dissent in *Samson*, which we followed in *Ochoa*. In his dissent in *Samson*, Justice Stevens found the notion of parolee consent-to-search provisions to be "sophistry." 547 U.S. at 863 n.4, 126 S. Ct. at 2206 n.4, 165 L. Ed. 2d at 267 n.4 (Stevens, J., dissenting). In truth, a parolee simply

> has no "choice" concerning the search condition; he may either remain in prison, where he will be subjected to suspicionless searches, or he may exit prison and still be subject to suspicionless searches. Accordingly, "to speak of consent in this context is to resort to a 'manifest fiction,' for 'the [parolee] who purportedly waives his rights by accepting such a condition has little genuine option to refuse.' "

*Id.* (quoting 5 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.10(b), at 440–41 (4th ed. 2004)).

Similarly, Justice Kennedy recognized the weakness of using consent predicated on the acceptance of adverse consequences in his concurring opinion in *Ferguson v. City of Charleston*, 532 U.S. 67, 90–91, 121 S. Ct. 1281, 1295, 149 L. Ed. 2d 205, 224 (2001) (Kennedy, J., concurring). While he disagreed with the majority's analysis regarding the purported special needs justification of a practice by a public hospital to require pregnant mothers who displayed certain symptoms and characteristics to consent to drug testing, Justice Kennedy also spoke in his concurring opinion to the nature of the consent dictated by the hospital. *See id.* He wrote:

---

right: the right to vote. *Id.* The Iowa Constitution does not strip prisoners or parolees of other rights. Thus, it is apparent that our holding in *Cullison*—that a parolee enjoys a comparable level of constitutional protection from unreasonable searches and seizures as nonparolees—was inextricably tied to the Iowa Constitution. Of course, our reliance on the Iowa Constitution would have been irrelevant if *Cullison* was a Federal Fourth Amendment case.

An essential, distinguishing feature of the special needs cases is that the person searched has consented, though the usual voluntariness analysis is altered because adverse consequences (*e.g.,* dismissal from employment or disqualification from playing on a high school sports team) will follow from refusal. The person searched has given consent, as defined to take into account that the consent was not voluntary in the full sense of the word. The consent, and the circumstances in which it was given, bear upon the reasonableness of the whole special needs program.

*Id.* (citations omitted). Thus, both our prior precedent and a line of authority outside Iowa has revealed that a consent-to-search clause in a parole agreement would not necessarily satisfy the type of consent to qualify as an exception to the search-and-seizure requirement under our Iowa Constitution.

The academic community has also recognized weaknesses in treating consent searches as voluntary searches in the context of the grant of parole. *Cf.* David T. Reindl, *Bargains or Unconstitutional Contracts? How Enforcement of Probation Orders as Contracts Could Take the Reasonableness Out of Probation Searches*, 33 New Eng. J. on Crim. & Civ. Confinement 123, 145–51 (2007). A predominant factor in this observation is the government's overwhelming bargaining power during negotiations tends to render these contracts essentially contracts of adhesion, with some particularly objectionable clauses and conditions of these contracts being both procedurally and substantively unconscionable. *Id.* at 149–51. Moreover, while the title of a legal document is not dispositive, a contractual theory may be especially inapplicable to parole conditions when, as in this case, they are part of a document that is itself entitled "Order." *See id.* at 146. That caption or title properly captures the real character of the transaction. Indeed, it has been noted that, while power imbalance can be a key factor in determining the validity of a contract, it has been an important factor in

the consent-to-search context since before *Schneckloth.* Christo Lassiter, *Consent to Search by Ignorant People*, 39 Tex. Tech L. Rev. 1171, 1189–91 (2007).

Professor LaFave has written extensively in this area and has concluded that a coercive atmosphere necessarily militates against finding that an ostensive consent is voluntary. 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.2(b), at 66, 81–90 (5th ed. 2012) [hereinafter LaFave]. The coercive atmosphere of physical detention in an official location is of the "greatest significance." *Id.* at 88. Professor LaFave concedes that " 'custody alone has never been enough in itself to demonstrate [coercion].' " *Id.* at 84–85 (quoting *United States v. Watson*, 423 U.S. 411, 424, 96 S. Ct. 820, 828, 46 L. Ed. 2d 598, 609 (1976)). Nonetheless, LaFave emphasizes the distinction between cases in which the subject of the search was either "free to leave or was in familiar surroundings at the time" and cases in which the search subject was in custody. *Id.* at 89–90 (footnotes omitted). Indeed, LaFave suggests this distinction was pivotal to the outcome of *Schneckloth* itself, stating, "[T]he Supreme Court [in *Schneckloth*] noted that, 'since consent searches will normally occur on a person's own familiar territory, the specter of incommunicado police interrogation in some remote station house is simply inapposite.' " *Id.* at 89 (quoting *Schneckloth*, 412 U.S. at 247, 93 S. Ct. at 2058, 36 L. Ed. 2d at 874).

LaFave's recognition that " 'the location and conditions' of even a brief detention may be such as to foreclose a finding of voluntary consent" is also instructive. *Id.* at 90 (footnote omitted) (quoting *United States v. Worley*, 193 F.3d 380, 387 (6th Cir. 1999)). Even seemingly innocuous circumstances such as a brief stop in an airport

> "make it easy for implicit threats or subtle coercion to exert tremendous pressure on an individual to acquiesce to the officer's wishes.  In such a situation it would be easy to misinterpret acquiescence to an officer's demands as consent; acquiescence cannot, of course, substitute for free consent."

*Id.* (quoting *United States v. Berry*, 670 F.2d 583, 596 (5th Cir. 1982)). We have similarly recognized the potential for coercion even in brief roadside stops.  *See State v. Pals*, 805 N.W.2d 767, 782–83 (Iowa 2011) (holding officer's request for consent in the squad car without informing Pals he was free to leave or warning him regarding his right to refuse consent was coercive).  In other words, coercion can easily find its way into human interaction when detention is involved.

LaFave has also traced the development of consent-to-search clauses in probation and parole agreements to the now discredited "act of grace" theory of parole.  5 LaFave § 10.10(b), at 527; *see also Cullison*, 173 N.W.2d at 536–37 (rejecting the "act of grace" theory of parole).[3] LaFave notes the effort to revive the "act of grace" theory can be traced to a 1967 article.  5 LaFave § 10.10(b), at 527.  The article advised states to

> "make the right to conduct a search and seizure . . . an express condition of parole or probation, as the case may be, which the defendant knowingly accepts.  Constitutional rights may be waived and if a court should hold that the Fourth Amendment is applicable in these instances, the rights could be waived in this manner."

---

[3]The "act of grace" theory was built upon the argument that parole is a "privilege."  5 LaFave § 10.10(b), at 525–26.  The United States Supreme Court rejected this theory two years after the Iowa Supreme Court did.  *See Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S. Ct. 2593, 2601, 33 L. Ed. 2d 484, 495 (1972).  The Court stated:

> It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a "right" or a "privilege."  By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment.

*Id.*

*Id.* (quoting Alexander Holtzoff, *The Power of Probation and Parole Officers to Search and Seize*, 31 Fed. Probation 3, 7 (1967)).  As our own research indicates, LaFave observed that many courts confronted with these purported waivers of constitutional protections have approved of them. *Id.* at 529–30.

However, LaFave disagrees with these holdings.  *Id.* at 530–31.  A proper application of *Schneckloth* requires more than a superficial inquiry into the existence of a parole agreement containing a consent provision.  *Id.* at 532.  LaFave concludes by drawing a connection between *Schneckloth*'s reliance on Fifth Amendment cases that analyze the voluntariness of a confession and

> the long established rule that a confession is not voluntary when given in response to an assurance by the maker "that, by so doing, he might at least obtain a mitigation of the punishment for the crime which otherwise would assuredly follow."

*Id.* (quoting *Bram v. United States*, 168 U.S. 532, 565, 18 S. Ct. 183, 195, 42 L. Ed. 568, 581 (1897)).  He doubts whether such a "quid pro quo . . . could pass muster under *Schneckloth*" and opines this may be the very reason the United States Supreme Court has consistently analyzed searches of parolees and probationers on other grounds.  *Id.*

Other commentators have argued that contractual thinking nonetheless has a place in constitutional search-and-seizure analysis, particularly when the government is not obligated to extend a certain privilege or benefit in the first place.  William J. Stuntz, *Implicit Bargains, Government Power, and the Fourth Amendment*, 44 Stan. L. Rev. 553, 555 (1992) [hereinafter Stuntz]; *see also* Michael Chmelar, *Contract Law and Its Potential Impact on Parole and Probation Searches*, 28 N. Ill. U. L. Rev. 43, 54–56 (2007); *cf.* Kathleen M. Sullivan, *Unconstitutional Conditions*,

102 Harv. L. Rev. 1413, 1422 (1989) ("What government benefits give rise to unconstitutional conditions problems?  Those benefits that government is permitted but not compelled to provide. . . . Unconstitutional conditions problems . . . do not arise if government is obligated to provide a benefit.").  Yet, by analogy, while a government could argue it could decline to offer public housing altogether and thus should be able to require waiver of constitutional search-and-seizure protection as consideration for offering the public housing in the first place, this argument would be a "bluff," given society's acceptance of public housing.  Stuntz, 44 Stan. L. Rev. at 568.  It would not necessarily be a bluff if society did not value available options for affordable public housing.  *Id.*  The application of these principles to searches of parolees is somewhat difficult.  On the one hand, granting parole decreases the government's financial burden of operating a prison system.  *See id.* at 580.  Articulating stricter standards for searches of parolees, on the other hand, *would* likely limit the number of prisoners granted such lighter treatment, as the costs of supervising probationers and parolees would also rise.  *Id.* at 581.  Thus, this consequence would ultimately have the effect of redistributing the loss of freedom from parolees subject to enhanced supervision techniques to increased numbers of prisoners whose grant of conditional freedom is either delayed or never granted.  *Id.*

Another commentator has argued that the government could not in fact choose not to grant parole for at least some prisoners given that prisons, like other government departments, face budgetary restrictions.  Antoine McNamara, Note, *The "Special Needs" of Prison, Probation, and Parole*, 82 N.Y.U. L. Rev. 209, 237 (2007) [hereinafter McNamara].  McNamara notes that a recent study found that not offering parole or

probation would "more than triple the inmate population." *Id.* at 237 & n.191 (citing Lauren E. Glaze & Seri Palla, U.S. Dep't of Justice, Bureau of Statistics, Probation and Parole in the United States 1–2 (2005)). Therefore, contrary to Judge Posner's assertion in *Barnett* that parolees and probationers "[give] up nothing" by agreeing to submit to warrantless, suspicionless searches, *see* 415 F.3d at 692, the parolee or probationer actually gets nothing in return for waiving their constitutional search-and-seizure rights, McNamara, 82 N.Y.U. L. Rev. at 238.

Another article provides empirical data relevant to the other side of *Schneckloth*'s policy balancing equation. In the context of waivers of Fourth Amendment rights by probationers, one article surveyed forty-one Wisconsin probation officers after the Supreme Court's opinion in *Griffin* and found that a blanket waiver of search-and-seizure protections that "applies to all probationers is not necessary to adequately protect the public." *See* Howard P. Schneiderman, Comment, *Conflicting Perspectives from the Bench and the Field on Probationer Home Searches—Griffin v. Wisconsin Reconsidered,* 1989 Wis. L. Rev. 607, 610, 655 (1989) (arguing that, although probation officers appreciate warrantless home searches, a low rate of frequency of home searches combined with probation officer dislike of home searches indicates that warrantless home searches are not necessary for the maintenance of Wisconsin's probation system). Indeed, Schneiderman acknowledges that Justice Scalia's analogy to administrative searches may be apt in the context of home visits, but is inapposite in the context of "full-blown searches," which are generally conducted when the parole officer believes that a parole violation or crime may be taking place. *Id.* at 656–57.

With all this in mind, we proceed to consider the voluntariness of a prospective consent-to-search provision in a parole agreement used to justify a search of a parolee. Importantly, the issue is not whether the government can or cannot conduct a search of a parolee. The narrow question before us is whether the government can conduct the search based solely on consent required to be given by parolees as a condition of release from prison.[4] Every search of a citizen by the government must be supported by some recognized ground or justification, and we must only decide if consent extracted from prisoners as a condition of release on parole constitutes one such ground. We have no occasion in this case to consider other grounds available to the State to justify such a search.

Unlike the situation in *Zap*, the voluntary nature of the consent to search was not supported by the benefit of the bargain found on the face of the parole agreement in this case. We appreciate that the bargain under a contract can, at times, involve a choice between two unpalatable

---

[4]Our ultimate resolution of this case does not render the conditions of a parole agreement unenforceable. The State may ordinarily impose any reasonable condition on the grant of parole. *Cf. State v. Valin*, 724 N.W.2d 440, 445–46, 448–49 (Iowa 1996) (recognizing the state may impose reasonable conditions of probation, but holding that a probation condition requiring a sex offender who was convicted of operating while intoxicated to be subjected to a penile plethysmograph exam for sexual arousal was unreasonable). A violation of that condition can result in a revocation of parole and a return to prison. Thus, our decision does not mean parolees are not required to follow reasonable conditions of parole, including a reasonable search provision, or that they could not have parole revoked for failing to comply with a term in the parole agreement. This case only deals with the narrow question whether the government may *enforce compliance* with a condition of probation through the contractual principle of consent. The reasonableness standard does not supersede the voluntariness standard for determining the validity of searches conducted to a purported consent. If it did, we think very little would remain of the voluntariness standard articulated in *Schneckloth*. This is precisely because the State *imposes* reasonable conditions; the prospective parolee does not *agree* to them. *See* Iowa Admin. Code r. 201—45.1(2)(*a*) ("The parolee may not be released on parole prior to the execution of the parole agreement. The parole agreement *shall contain* the conditions of parole pursuant to rule 45.2(906) . . . ." (emphasis added)); *id.* r. 201—45.2 (listing ten standards of condition of parolee with which the parolee "shall" comply).

alternatives, which does not defeat the voluntariness of the consent. *See Barnett*, 415 F.3d at 692 (declaring that a choice between accepting probation as a term of a plea bargain is more valuable than the risk of going to prison following a trial); *Benton*, 695 N.E.2d at 762 (rejecting an argument that defendant "had no choice but to sign a waiver as a condition of his parole, thereby implying that the waiver was not voluntary"); *Anderson*, 507 S.E.2d at 341 (holding grant of consent in a parole agreement was voluntary even though the terms of the agreement were "dictated by the Commonwealth" and the defendant signed "only to avoid time in jail"). However, this proposition does not mean a choice between two unpalatable alternatives can never be coercive. *See Schneckloth*, 412 U.S. at 224, 93 S. Ct. at 2046, 36 L. Ed. 2d at 861 (" 'Except where a person is unconscious or drugged or otherwise lacks capacity for conscious choice, all incriminating statements—even those made under brutal treatment—are "voluntary" in the sense of representing a choice of alternatives.' " (quoting Paul M. Bator & James Vorenberg, *Arrest, Detention, Interrogation and Right to Counsel: Basic Problems and Legislative Solutions*, 66 Colum. L. Rev. 62, 72 (1966))). Parole is simply one of those times when a choice to remain in prison with no constitutional rights involving search and seizure or to gain freedom with no constitutional rights involving search and seizure is simply "no choice at all." *Tamez*, 534 S.W.2d at 692. When a constitutional right is at stake, more than a one-sided agreement is needed to establish waiver of the right.

The obligation of courts to examine the voluntariness of an agreement is nothing new and is supported by our law of contracts. For instance, we refuse to enforce unconscionable contracts. *See Casey v. Lupkes*, 286 N.W.2d 204, 207 (Iowa 1979) (recognizing unconscionability

as a generally available contract defense); *see also* Restatement (Second) of Contracts § 208 (1981) (permitting a court to refuse to enforce all or part of a contract if the contract was unconscionable when formed). The doctrine is especially applicable to contracts of adhesion. *See C & J Fertilizer, Inc. v. Allied Mut. Ins. Co.*, 227 N.W.2d 169, 179–81 (Iowa 1975). This refusal is based on a strong distaste for the enforcement of unjust terms between parties of grossly disproportionate bargaining power. As we quoted in a recent case:

> "A bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party. *But gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms.*"

*In re Marriage of Shanks*, 758 N.W.2d 506, 515 (Iowa 2008) (quoting Restatement (Second) of Contracts § 208 cmt. *d*). This language accurately summarizes the nature of a consent-to-search provision in a parole agreement and reveals that the failure to enforce search provisions is consistent with other occasions when we have refused to enforce terms of a contract that were, in all reality, not consensual.

A practical reality regarding the release of prisoners on parole bolsters our conclusion. Generally, a prisoner in the Iowa state penal system automatically earns one day of good-time credit for each day served. *See* Iowa Code § 903A.2(1)(*a*). Accordingly, the time when parole can be offered to an inmate is cut in half by good-time credits. Additionally, parole in most cases is offered much earlier. For example, according to a recent annual report from the board of parole, the average time served in prison prior to obtaining parole on a conviction for

possession of marijuana with intent to distribute was only eighteen months, not ten years. Iowa Board of Parole, Annual Report for State Fiscal Year 2011 (2012), at 18 tbl. 6. The average time served prior to the grant of parole for failure to affix a tax stamp was 18.6 months. *Id.* The average time served for possession of a firearm by a felon was only 16.2 months, not five years. *Id.* Thus, the average prospective parolee who committed the same crimes as Baldon would face more than eight additional years in prison if he or she did not sign the parole agreement containing a search provision. Under these circumstances, it is unreasonable to believe that the reality of consent normally derived from the benefits exchanged between the parties to a contract applies to parole agreements. The amount of freedom typically at stake points to the coercive nature of consent searches as a precondition to release.

Additionally, a prisoner essentially has nothing to bargain when it comes to parole because the parole system does not offer early parole to inmates who agree to be searched if paroled. Instead, inmates are entitled to parole under a different calculation, but the parolee must nevertheless agree to the terms of parole as a condition of release. Iowa Admin. Code r. 201—45.1(2) ("The parolee may not be released on parole prior to the execution of the parole agreement."). Thus, the refusal to consent to a warrantless and suspicionless search simply means many, many more years in prison, while giving consent does not offer release to a parolee earlier than otherwise entitled. More fundamentally, parolee consent searches are conceptually detached from the concept of bargaining because the State would be able to impose any reasonable term of parole irrespective of the consent of the parolee.

From a practical standpoint, consent under these circumstances is not real. We are duty bound to give the liberty in article I, section 8 of

our constitution the integrity it deserves and demands, and we must not allow the government to avoid an important constitutional check on its power by using an unfair play on human nature. To give article I, section 8 its integrity, we must hold Baldon's acceptance of the parole agreement did not constitute consent under our precedent.

Moreover, there was no additional evidence in the record to reveal Baldon voluntarily consented to a search, even in the absence of bargaining power. The conclusory evidence in this case that Baldon read and understood the terms of the parole agreement does not establish his consent. Nevertheless, the State relied on the parole agreement alone to establish consent, which we conclude is inadequate.

Considering our obligation to ensure that consent remains a doctrine of voluntariness that functions with integrity, we conclude a parole agreement containing a prospective search provision is insufficient evidence to establish consent. Such a contract reveals an absence of bargaining power on behalf of the parolee, rendering contract principles inadequate to entitle the state to enforce compliance of a search provision. The purported consent extracted from a prisoner as a condition of release fails to constitute voluntary consent. As a mandatory term of parole, such consent would also have the effect of justifying the search on the basis of parole status. This is not permitted under *Ochoa.* More is needed, and a consent provision in a parole agreement does not supply this additional justification because it fails to pass the test of voluntariness required under article I, section 8 of the Iowa Constitution.

### V. Conclusion.

For the reasons stated above, we hold that the search provision contained in Baldon's parole agreement does not represent a voluntary

grant of consent within our constitutional meaning. As such, the suspicionless search of Baldon's car violated article I, section 8 of the Iowa Constitution. Accordingly, the district court's denial of Baldon's motion to suppress is reversed, and the case is remanded to the district court for further proceedings.

**REVERSED AND REMANDED FOR NEW TRIAL.**

Wiggins, Hecht, Appel, and Zager, JJ., join this opinion; Appel, J., files a separate concurring opinion; and Mansfield, J., files a dissenting opinion in which Waterman, J., joins.

#10–0214, *State v. Baldon*

**APPEL, Justice (concurring specially).**

I join in the majority opinion, but write to review the foundations of the well-established Iowa law that we jealously reserve our right to construe our state constitution independently of decisions of the United States Supreme Court interpreting parallel provisions of the Federal Constitution.

**I. Historic Role of State Constitutions.**

**A. State Constitutions, Declarations of Rights, and Judicial Review Prior to Ratification of United States Constitution.** Suppose a leading historian asks you to identify a period in American history. The historian tells you the period in question was "the most creative and significant period of constitutionalism in modern Western history." The historian further advises you that many able and dedicated persons were drawn away from their other important political responsibilities to engage in legal drafting. Finally, the historian advises you that the end work product of those who labored "captured the attention of intellectuals everywhere in the world" and was "published and republished in several European languages." With these three clues, you might be tempted to answer that the period being described is the several months in 1787 when the delegates to the Constitutional Convention in Philadelphia drafted the United State Constitution. But you would be wrong.

The above description is based on the writing of Gordon Wood, a leading historian of the Revolutionary Era and the Early Republic. He was writing with such panache not about the Constitutional Convention in Philadelphia, but about the period beginning in 1776 when states began the process of drafting their own independent state constitutions. *See* Gordon S. Wood, *Foreword: State Constitution-Making in the*

*American Revolution,* 24 Rutgers L.J. 911, 911, 913–14 (1993) [hereinafter Wood].

While the Philadelphia convention and its aftermath have greater notoriety today, the construction of independent state constitutions was an important legal development. More than a decade before the Constitutional Convention in Philadelphia, the Continental Congress in May 1776 encouraged the establishment of state governments with "all the powers of government exerted, under the authority of the people of the colonies." *See* Jack Rakove, *The Beginnings of National Politics: An Interpretative History of the Continental Congress* 96–97 (1979); Merrill Jensen, *The Articles of Confederation: An Interpretation of the Social– Constitutional History of the American Revolution 1774–1781* 98 (1948); *see also* IV *Journals of the Continental Congress, 1774–1789* 358 (Worthington C. Ford et al., ed. 1904–37) [hereinafter *Journals of the Continental Congress*]. A few weeks later, the Declaration of Independence declared that "these United Colonies are, and of Right ought to be Free and Independent States." The Declaration of Independence para. 32 (U.S. 1776). By the time of the Declaration, the states had already begun to develop their structures, including their constitutions. Edmund S. Morgan, *The Birth of the Republic, 1763–89* 88–89 (3d ed. 1992) [hereinafter Morgan]; Wood, 24 Rutgers L.J. at 913. John Adams, George Mason, James Madison, John Jay, and Governor Morris, among others, participated in the drafting of these state constitutions. I Melvin Urofsky & Paul Finkelman, *A March of Liberty: A Constitutional History of the United States* 66, 69–70 (2d ed. 2011).

Thus, upon declaring independence, the people did not return to a Hobbesian state of nature. Rather, the prior colonial governments evolved into "Independent States" through a constitutional process. By

the end of 1776, ten state governments were in place, with the rest being completed in 1780.  Morgan at 90; Wood, 24 Rutgers L.J. at 913–14. From the get-go, these state constitutions were designed to be stand alone sources of law.  As noted by Fletcher M. Green, the colonialists debated extensively in the months preceding independence whether the states should adopt a uniform constitution, to be prepared by the Continental Congress.  Fletcher M. Green, *Constitutional Development in the South Atlantic States, 1776–1860: A Study in the Evolution of Democracy* 52–54 (W.W. Norton & Co. 1966) [hereinafter Green]. Ultimately, following the proposal of John Adams, the Continental Congress recommended that the states form their own constitutions that " 'in the opinion of representatives of the people, best conduce to the happiness and safety of their constituents in particular, and America in general.' "  *Id.* at 54 (quoting IV *Journals of the Continental Congress* at 342); *see also* Willi Paul Adams, *The First American Constitutions: Republican Ideology and the Making of State Constitutions in the Revolutionary Era* 55–56 (Rita & Robert Kimber trans., Madison House Books, expanded. ed. 2001) (describing Adams's reasoning in recommending to New Hampshire that it form its own government). Thus, the colonialists expressly rejected uniformity.  Green at 54.

The approval of the Articles of Confederation did not alter the status of state constitutions as independent sources of law.  The constitutions of what the Declaration of Independence called "Independent States" coexisted with the Articles of Confederation.  Under the Articles of Confederation, the states, not the people, were represented in the Congress.  John P. Kaminski, *The Constitution Without a Bill of Rights, in The Bill of Rights and the States: The Colonial and Revolutionary Origins of American Liberties* 16, 18 (Patrick T. Conley & John P.

Kaminski eds., 1992) [hereinafter Kaminski]. Article II of the Articles of Confederation structured the relationship between the states and the "United States, in Congress assembled." *See* Articles of Confederation of 1781, art. II. It provided, "Each state retains its sovereignty, freedom, and independence, and every power, jurisdiction and right, which is not by this confederation expressly delegated to the United States, in Congress assembled." *Id.*

By the time of the Constitutional Convention in Philadelphia, eleven states had written constitutions (Connecticut and Rhode Island continued governance under modified colonial charters). Ralph Ketcham, *Introduction, in The Anti-Federalist Papers and the Constitutional Convention Debates* 1, 3 (Ralph Ketcham ed., 1986) [hereinafter Ketcham]; Advisory Commission on Intergovernmental Relations, *State Constitutions in the Federal System* 7 (1989) [hereinafter *State Constitutions in the Federal System*]; *see also generally* Albert L. Sturm, *The Development of American State Constitutions*, 12 Publius 57, 60–63 (1982). This state constitutional experience was recognized by Thomas Jefferson, who is said to have calculated that by 1787 the states collectively shared 150 years of experience in republican government. Ketcham at 3. As a result, when the conclave opened in Philadelphia, there was already a mature state constitutional tradition upon which the founders could draw. Donald S. Lutz, *The Origins of American Constitutionalism* 5 (1988).[5] Thus, the United States Constitution was

---

[5]There is substantial literature regarding the formation of state constitutions prior to the adoption of the United States Constitution. *See, e.g.*, Willi Paul Adams, *The First American Constitutions: Republican Ideology and the Making of State Constitutions in the Revolutionary Era* 55–56 (Rita & Robert Kimber trans., Madison House Books, expanded. ed. 2001); *The Constitutionalism of American States* (George E. Connor & Christopher W. Hammons eds., 2008); Marc W. Kruman, *Between Authority and Liberty: State Constitution Making in Revolutionary America* (1997); *see also* Gordon S. Wood,

not created by some kind of legal Big Bang, but instead was the outgrowth of colonial experience and state constitutional precedents.

Many of these early independent state constitutions had declarations of rights or similar provisions. *See* 1 Jennifer Friesen, *State Constitutional Law: Litigating Individual Rights, Claims, and Defenses*, § 1.03[1], at 1–7 to 1–10 (4th ed. 2006) [hereinafter Friesen]. Eight of these early state constitutions (Virginia, Pennsylvania, Delaware, Maryland, North Carolina, Vermont, Massachusetts, and New Hampshire) had search and seizure provisions. Bernard Schwartz, *The Great Rights of Mankind: A History of the American Bill of Rights* 88 (Madison House 1992) [hereinafter Schwartz]. Of particular interest is the Massachusetts search and seizure provision. This important search and seizure provision was drafted by John Adams, who as a young lawyer was thrilled to hear James Otis rail in Paxton's case against the new writs of assistance issued by the English crown. *See, e.g.*, Leonard W. Levy, *Origins of the Bill of Rights* 157–59 (1999) [hereinafter Levy]; John M. Murrin, *From Liberties to Rights: The Struggle in Colonial Massachusetts, in The Bill of Rights and the States: The Colonial and Revolutionary Origins of American Liberties* 63, 88–91, 94 (Patrick T. Conley & John P. Kaminski eds., 1992) [hereinafter Murrin]. Adams's experience influenced the text of the provision. Levy at 158; Murrin at 91. It states:

> Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order

---

*Foreword: State Constitution-Making in the American Revolution*, 24 Rutgers L.J. 911 (1993).

in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws.

Mass. Const. of 1780, art. XIV.

In contrast to many of the Revolutionary Era state constitutions, the Articles of Confederation had no bill of rights. Under the Articles of Confederation, however, Congress had no power over individuals and only limited authority with respect to the states. Kaminski at 18. Thus, there arguably was no need for a bill of rights as Congress had no direct authority over the people. *Id.*

In addition, state court judges operating under Revolutionary Era state constitutions were developing the principle of judicial review in a series of state constitutional cases decided before ratification of the United States Constitution and *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803). On several occasions, state courts ruled state statutes purporting to limit the right to jury trials were unconstitutional. For example, in the 1780 New Jersey case of *Holmes v. Walton*, an unpublished decision, the court found a statute permitting trial by a six-man jury unconstitutional under the New Jersey Constitution. Schwartz at 95; *see also State v. Parkhurst*, 9 N.J.L. 427, 444 (1802) (describing that "the act upon solemn argument [in *Holmes*] was adjudged to be unconstitutional, and in that case inoperative"). In 1786 and 1787, New Hampshire courts found unconstitutional an act providing that certain actions for damages totaling less than ten pounds could be tried by a justice of the peace without a jury. William Michael Treanor, *Judicial Review Before* Marbury, 58 Stan. L. Rev. 455, 475–76 & n.83 (2005). In the unreported Rhode Island case *Trevett v. Weeden*, the Rhode Island

Supreme Court struck down a law passed in 1786 that imposed a penalty, without requiring a jury trial, on those who did not accept the state's paper money in place of gold and silver. *Id.* at 476–78. In *Bayard v. Singleton*, 1 N.C. (Mart.) 5 (1787), the North Carolina Supreme Court concluded a statute barring loyalists from challenging the state's seizure of their property was unconstitutional because the North Carolina Constitution provided for a jury trial whenever property was at issue in a legal dispute. Treanor, 58 Stan. L. Rev. at 478–79. These pre-*Marbury* cases expanded to other areas of the law. For example, in 1784 the New York City Mayor's Court held a statute could not override a treaty or international law in *Rutgers v. Waddington*, also unreported. Schwartz at 97. *See generally* Treanor, 58 Stan. L. Rev. at 480–87. To arrive at this conclusion, the court noted New York's constitution adopted the common law and, therefore, the law of nations. Treanor, 58 Stan. L. Rev. at 483. In what has become known as the "Case of the Prisoners," reported as *Commonwealth v. Caton*, 8 Va. (4 Call) 5 (1782), a number of Virginia judges embraced judicial review in finding certain pardons unconstitutional. *See* William Michael Treanor, *The Case of the Prisoners and the Origins of Judicial Review*, 143 U. Pa. L. Rev. 491 (1994).

Three points emerge from the above discussion. First, prior to the ratification of the United States Constitution, state constitutions, the first American constitutions, were independent sources of law. Second, many of the independent state constitutions, unlike the Articles of Confederation, had bill-of-rights-type provisions designed to restrain arbitrary government action, including provisions related to government search and seizure. Finally, at least some state courts were developing the principle of judicial review under their state constitutions decades prior to *Marbury v. Madison.*

**B. The Impact of Ratification and Adoption of the Bill of Rights of the United States Constitution on Independent State Constitutional Law**. The United States Constitution was not designed to obliterate the states and their preexisting constitutions, but to instead draw them into a federal system with many of their functions largely intact. As noted by Herbert Wechsler in the first sentence of his seminal law review article, maintenance of the state's residual sovereignty was the "means and price of the formation of the Union." Herbert Wechsler, *The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government*, 54 Colum. L. Rev. 543, 543 (1954).

Of course, the proposed United States Constitution imposed important limitations on the states. Federal law would prevail over state law under the Supremacy Clause.[6] U.S. Const. art. VI, cl. 2. The Guarantee Clause provided that the United States "shall guarantee" that every state has a "Republican Form of Government." *Id.* art. IV, § 4. Further, Article I, Section 10 prohibited states from entering into treaties, alliances or confederations, from coining money, from laying imposts or duties on imports or exports except to an extent necessary to execute inspection laws, from maintaining armies during times of peace, from

---

[6]Under the Supremacy Clause, "[T]he Judges in every State shall be bound [by federal law], any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. As a result, the United States Supreme Court has invalidated state constitutional provisions that violate the United States Constitution. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 635–36, 116 S. Ct. 1620, 1629, 134 L. Ed. 2d 855, 868 (1996) (striking down Colorado constitutional provision affecting gay rights); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 783, 827, 115 S. Ct. 1842, 1845, 1866, 131 L. Ed. 2d 881, 888, 914–15 (1995) (striking down Arkansas constitutional provision imposing term limits on members of Congress); *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 322–23, 329–30, 18 L. Ed. 356, 362–63, 365 (1867) (striking down loyalty oath imposed by Missouri Constitution).

entering into alliances with foreign states, from engaging in war unless actually invaded, and from enacting certain kinds of legislation, such as bills of attainder, ex post facto laws, and laws impairing the right of contracts. *Id.* art. I, § 10.

Although the draft United States Constitution contained a number of provisions related to civil liberties,[7] founders at the Constitutional Convention in Philadelphia did not consider whether to include a bill of rights in the proposed constitution until five days from the end of the convention. Richard Labunski, *James Madison and the Struggle for the Bill of Rights* 9 (2006) [hereinafter Labunski]. George Mason, who was largely responsible for the Declaration of Rights in the Virginia Constitution, and Elbridge Gerry of Massachusetts proposed that a committee be appointed to draft bill of rights provisions to be incorporated into the Federal Constitution. *Id.* at 8–12; *see also* Robert Allen Rutland, *The Birth of the Bill of Rights 1776–1791* 112–13 (1955) [hereinafter Rutland]. One scholar has suggested the convention decided not to include a bill of rights perhaps out of fatigue as much as anything else. Labunski at 9.

Overall, however, the founders looked to the states to protect individual liberties. At the Constitutional Convention, James Wilson observed that the purpose of the states was "to preserve the rights of individuals." I *Records of the Federal Convention of 1787* 356 (Max

---

[7]Civil liberties provisions in the original draft Constitution included the prohibition against suspension of the writ of habeas corpus except in case of rebellion or invasion, the prohibitions of bills of attainder and ex post facto laws, the provisions for impeachment of all civil officers, the guarantee of jury trials in criminal cases, the narrow definition of treason, and the ban on religious qualifications for office holding. *See* U.S. Const. art. I, § 9, cls. 2–3; *id.* art. II, § 4; *id.* art. III, § 2, cl. 3; *id.* art. III, § 3, cl. 1; *id.* art. VI, cl. 3.

Farrand ed., 1937). Similarly, in Federalist No. 45, Madison stressed that under the Constitution, "The powers reserved to the several States will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties and properties of the people . . . ." *The Federalist No. 45*, at 236 (James Madison) (Garry Wills ed., 1982). Madison repeated the liberty theme in Federalist No. 51 by declaring, "In the compound republic of America, the power surrendered by the people, is first divided between *two distinct governments* . . . . Hence, *a double security* arises to the rights of the people." *The Federalist No. 51*, at 264 (James Madison) (Garry Wills ed., 1982) (emphasis added).

Notwithstanding Madison's efforts, antifederalists made much hay over the failure of the Constitution to ensure in more specific language that the power of states would be preserved. *See* Pauline Maier, *Ratification: The People Debate the Constitution, 1787–1788* 86–95 (2010) [hereinafter Maier]. As noted above, the Articles of Confederation expressly reserved all powers except those specifically enumerated to the states. Opponents of the Constitution wondered why such a provision was omitted from the proposed United States Constitution. *See, e.g., id.* at 90–92.

In addition, opponents to the Constitution asked why the framers failed to include a bill of rights. *See, e.g., id.* at 44, 87. Opponents noted that many state constitutions contained a bill of rights, and they wondered why a similar approach was not taken in the United States Constitution. *Id.* at 44 (citing views of George Mason). The response of the supporters of the Constitution that the federal government was one of enumerated powers and that a bill of rights was therefore unnecessary was unpersuasive to many. *Id.* at 79.

While proponents of the Constitution were able to obtain unconditional ratification of the Constitution, their success was in part obtained by agreeing to a process in which future curative amendments to the Constitution would be considered. *See, e.g.,* Kaminski at 25–38 (providing overview of ratification process, in which seven states, including Massachusetts, Virginia, and New York, ratified the Constitution and proposed amendments); Maier at 192–98 (describing the striking of a deal between the Federalists and John Hancock that included proposing future amendments to the Constitution at the first meeting of Congress and political support for Hancock in future elections). Relying in part on the rights provisions of the Massachusetts and Pennsylvania Constitutions, Madison drafted and Congress proposed amendments to the ratified United States Constitution that came to be known as the Bill of Rights. *See, e.g.,* Levy at 35–43; Rutland at 202.

The addition of the Bill of Rights to the United States Constitution did not affect the independent nature of state constitutional provisions related to civil liberties. Under the Tenth Amendment, "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Plainly, the United States Constitution does not delegate the judicial power to provide final, authoritative interpretation of state constitutions. And while there are many provisions of the United States Constitution limiting the power of states, there are no provisions prohibiting or restricting the power of state courts to interpret authoritatively their state constitutions. *See State v. Schwartz*, 689 N.W.2d 430, 438 (S.D. 2004) (Konenkamp, J., concurring) (citing Tenth Amendment in finding that state supreme court had an obligation to decide whether the South Dakota Constitution required stricter

standards for search and seizure than required by the United States Constitution).

The new amendments to the United States Constitution created a *Federal* Bill of Rights.  These provisions were not originally thought to apply against the states.  The issue was confronted in *Barron v. Mayor of Baltimore*, 32 U.S. (7 Pet.) 243, 250–51, 8 L. Ed. 672, 675 (1833), when the strongly nationalistic Chief Justice John Marshall wrote for the United States Supreme Court that the provisions of the Federal Bill of Rights did not apply against the states.  Chief Justice Marshall wrote, "Each state established a constitution for itself, and in that constitution, provided such limitations and restrictions on the powers of its particular government, as its judgment dictated."  *Id.* at 247, 8 L. Ed. at 674.  Thus, the Federal Bill of Rights did not supplant the state constitutional provisions upon which it was patterned, nor did it trump the provisions of state constitutions adopted after its enactment.

The result of *Barron* was "that state protections of liberty were more relevant to most people than the protections in the federal Bill of Rights."  Paul Finkelman & Stephen E. Gottlieb, *Introduction: State Constitutions and American Liberties*, *in Toward a Usable Past: Liberty Under State Constitutions* 9 (Paul Finkelman & Stephen E. Gottlieb eds., 1991).  As noted by Chief Justice Cady,

> Our Iowa Constitution, like other state constitutions, was designed to be the primary defense for individual rights, with the United States Constitution Bill of Rights serving only as a second layer of protection, especially considering the latter applied only to actions by the federal government for most of our country's history.

Mark S. Cady, *A Pioneer's Constitution: How Iowa's Constitutional History Uniquely Shapes Our Pioneering Tradition in Recognizing Civil Rights and Civil Liberties*, 60 Drake L. Rev. 1133, 1145 (2012).

At the time of the adoption of the current Iowa Constitution in 1857, *Barron* was good law. As a result, the Iowa Constitution contains a number of provisions, including article I, section 8, Iowa's search and seizure provision, which are designed to protect individual liberties against encroachment by state officials. *See generally* Iowa Const. arts. I–II. While contemporary sources related to the Iowa Constitutional Convention are limited, there is no reason to conclude the framers of the Iowa Constitution expected that article I, section 8 would receive a cramped interpretation. They placed the Iowa Bill of Rights at the beginning of the Iowa Constitution to emphasize its importance. *State v. Ochoa*, 792 N.W.2d 260, 274 (Iowa 2010). This priority placement has led one observer to declare that, more than the United States Constitution, the Iowa Constitution "emphasizes rights over mechanics." Donald P. Racheter, *The Iowa Constitution: Rights over Mechanics, in The Constitutionalism of American States* 479, 479 (George E. Connor & Christopher W. Hammons eds., 2008). Further, George Ellis, Chairman of the Committee on the Preamble and Bill of Rights, stated the committee wanted provisions in the Iowa Bill of Rights that "would enlarge, and not curtail the rights of the people" and would "put upon record every guarantee that could be legitimately placed there in order that Iowa . . . might . . . have the best and most clearly defined Bill of Rights." 1 *The Debates of the Constitutional Convention of the State of Iowa* 100 (W. Blair Lord rep., 1857). The committee did not consider itself some kind of Committee on Constitutional Redundancy and Duplication. Like the drafters of Revolutionary Era state constitutions

that predated the United States Constitution, the Iowa founders considered the development of independent state constitutional rights as serious business.

In sum, the ratification of the United States Constitution and the subsequent adoption of the Bill of Rights had no impact on the status of state constitutions as an independent source of law. Moreover, the drafters of the Iowa Constitution were well aware of this basic feature of the federalist system when they fashioned the independent civil liberties provisions of the Iowa Constitution of 1857.

**C. Impact of the Civil War Amendments on Independent State Constitutional Law.** The passage of the Thirteenth, Fourteenth, and Fifteenth Amendments after the Civil War significantly altered the relationship between the federal government and the states. In particular, unlike most of the provisions of the original Bill of Rights in the United States Constitution, the Equal Protection, Due Process, and Privileges and Immunities Clauses of the Fourteenth Amendment expressly applied against the states. *See* U.S. Const. amend. XIV, § 1.

Like the passage of the Bill of Rights, the enactment of the Civil War Amendments did not alter state constitutions as an independent source of law. Instead, they simply provided a federal overlay to the state constitutional regime recognized by Chief Justice Marshall in *Barron.* As noted by Michigan Supreme Court Justice Thomas Cooley shortly after the Civil War, each state had the power to determine for itself what provisions are in its state constitution and "what protection shall be thrown around the person or property of the citizen." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 33 (Legal Classics Library 1987) (1868).

After the Civil War, the Iowa Supreme Court recognized its independent authority to construe the state constitution. In *McClure v. Owen*, 26 Iowa 243, 255 (1868), we declared:

> It does not require argument to show that the . . . same principles that require the federal courts to follow the decisions of the State courts in construing statutes, and to recognize rules of local law, require the federal courts to follow the construction given the Constitution by the highest State tribunal. There is no distinction that warrants the disregard of the rule in cases involving the construction of the State Constitution.

On questions of human rights, Iowa courts have traditionally demonstrated a remarkably broad vision. In *In re Ralph*, 1 Morris 1, 7 (1839), the Territorial Supreme Court rejected a claim that a slave present in a free state should be returned to his master, noting that under Iowa law a slave within the free territory of Iowa is not "property" and that the laws regarding illegal restraint apply "to men of all colors and conditions." While not based on the yet unadopted Iowa Constitution, the broad reasoning, tone, and attitude toward equality in *In re Ralph* stands in striking contrast to the disastrous majority opinion of the United States Supreme Court nearly two decades later in *Dred Scott v. Sanford*, 60 U.S. 393, 15 L. Ed. 691 (1857).

In *Clark v. Board of Directors*, 24 Iowa 266 (1868), we rejected the argument that a school district could forbid African American children from attending a school with whites on grounds of race. In *Clark*, our interpretation of applicable statutes was driven by a broad conception of article IX, section 12 of the Iowa Constitution, which requires the education of "all the youths of the State." *Id.* at 274–77. In *Coger v. Northwest Union Packet Co.*, 37 Iowa 145 (1873), we rejected the notion that African Americans could be subjected to different treatment when

being transported by public carriers. In reaching this far-sighted conclusion, we cited article I, section 1 of the Iowa Constitution, which declares, "All men are, by nature, free and equal," and noted that "[u]pon it we rest our conclusion in this case." *Id.* at 153–55. These Iowa equality cases have little in common with the majority opinion of the United States Supreme Court in *Plessy v. Ferguson*, 163 U.S. 537, 16 S. Ct. 1138, 41 L. Ed. 256 (1896), and much more in common with the powerful dissent by Justice John Marshall Harlan, *id.* at 555–64, 16 S. Ct. at 1145–48, 41 L. Ed. at 262–65 (Harlan, J., dissenting).

The independent Iowa constitutional tradition was repeatedly recognized in the first half of the twentieth century. In *State v. Height*, 117 Iowa 650, 654–55, 91 N.W. 935, 938 (1902), we held as a matter of state constitutional law that the privilege against self-incrimination was incorporated in the due process clause of article I, section 9 of the Iowa Constitution even though at the time the United States Supreme Court did not incorporate the Fifth Amendment against the states pursuant to the Due Process Clause of the Fourteenth Amendment. Then, in *McCollum v. McConaughy*, 141 Iowa 172, 176, 119 N.W. 539, 540–41 (1909), we noted that, although we followed the United States Supreme Court's pronouncements on questions of federal constitutional law, in our construction of a parallel state constitutional provision, "[w]e are not bound . . . by any obligation imposed upon us in the federal Constitution to uphold a State statute merely because, in the view of the Supreme Court of the United States, it is not unconstitutional."

The responsibility of this court to exercise independent judgment under the Iowa Constitution was well illustrated in *State v. Tonn*, 195 Iowa 94, 191 N.W. 530 (1923). In *Tonn*, we considered whether holdings by the United States Supreme Court in *Boyd v. United States*, 116 U.S.

616, 6 S. Ct. 524, 29 L. Ed. 746 (1886), under the Fourth and Fifth Amendments of the United States Constitution should be followed under parallel provisions of the Iowa Constitution. *Tonn,* 195 Iowa at 104, 191 N.W. at 535. In *Boyd,* the United States Supreme Court held that the forced production of business papers absent probable cause and their admission at a subsequent hearing "were erroneous and unconstitutional proceedings." 116 U.S. at 638, 6 S. Ct. at 536–37, 29 L. Ed. at 754. Using a methodology anticipating our approach in *State v. Cline,* 617 N.W.2d 277 (Iowa 2000), *abrogated on other grounds by State v. Turner,* 630 N.W.2d 601, 606 n.2 (Iowa 2001), *State v. Ochoa,* 792 N.W.2d 260 (Iowa 2010), and *State v. Pals,* 805 N.W.2d 767 (Iowa 2011), the majority in *Tonn* noted that the decision of the United States Supreme Court in *Boyd* "give[s] us pause" and then proceeded to canvas academic authorities, authorities in other states, and dissenting federal cases in concluding the approach of the United States Supreme Court in *Boyd* should no longer be followed in Iowa. *Tonn,* 195 Iowa at 103–09, 191 N.W. at 534–36 (internal quotation marks omitted). In *Cline,* we rejected *Tonn,* holding the "good faith exception" to the exclusionary rule was incompatible with article I, section 8 of the Iowa Constitution. *Cline,* 617 N.W.2d at 292–93. Nonetheless, the approach in *Tonn* shows judicial recognition in Iowa of this court's responsibility to engage in independent constitutional analysis of state constitutional provisions that parallel federal constitutional provisions.

Clearly, the Civil War Amendments to the United States Constitution did not supplant the provisions of the Iowa Bill of Rights. Our remarkable legal heritage demonstrates that construction by the United States Supreme Court of a parallel provision of the United States Constitution does not bind our court on issues under the Iowa

Constitution. Independent state constitutional analysis is nothing new, but has been long recognized in Iowa law.

**D. Incorporation of the Bill of Rights Through the Due Process Clause.** Beginning in 1925, the United States Supreme Court incorporated provisions of the Bill of Rights of the United States Constitution against the states under the Due Process Clause of the Fourteenth Amendment. *See Gitlow v. New York,* 268 U.S. 652, 666, 45 S. Ct. 625, 630, 69 L. Ed. 1138, 1145 (1925) (stating freedoms of speech and press are so fundamental that they are protected from state interference under the Due Process Clause). For the Fourth Amendment, this process began with *Wolf v. Colorado,* 338 U.S. 25, 27–28, 69 S. Ct. 1359, 1361, 93 L. Ed. 1782, 1785–86 (1949), and was extended by *Mapp v. Ohio,* 367 U.S. 643, 660, 81 S. Ct. 1684, 1694, 6 L. Ed. 2d 1081, 1093 (1961). Nothing in the Supreme Court's incorporation doctrine as it related to the Fourth Amendment altered the independent nature of state constitutional provisions related to search and seizure. Instead, incorporation of the provisions of the Bill of Rights of the United States Constitution against the states through the Due Process Clause of the Fourteenth Amendment established a federal floor related to civil liberties.

While incorporation was a major constitutional advancement, Justice John Marshall Harlan II was concerned that the nationalization of the Bill of Rights' protections would lead to a substantive dilution of those protections.[8] *See* Patrick E. Higginbotham, *The Continuing*

---

[8]Of course, it is impossible to determine the degree to which the changes in the United States Supreme Court's Fourth Amendment jurisprudence were due to the "federalism discount" that Harlan predicted or to changes in personnel on the United States Supreme Court. Explicit statements in Supreme Court opinions during the post-incorporation era show sensitivity to federalism concerns. *Meachum v. Fano,* 427 U.S.

*Dialogue of Federalism*, 45 U. Kan. L. Rev. 985, 988–91 (1997). In the search and seizure case of *Ker v. California*, 374 U.S. 23, 46, 83 S. Ct. 1623, 1646, 10 L. Ed. 2d 726, 745 (1963) (Harlan, J., concurring), Justice Harlan wondered whether the United States Supreme Court "[was] prepared to relax Fourth Amendment standards in order to avoid unduly fettering the States." A few years later, Justice Harlan saw "a major danger of the 'incorporation' approach—that provisions of the Bill of Rights may be watered down in the needless pursuit of uniformity." *Duncan v. Louisiana*, 391 U.S. 145, 182 n.21, 88 S. Ct. 1444, 1466 n.21, 20 L. Ed. 2d 491, 514 n.21 (1968) (Harlan, J., dissenting). In his dissent

---

215, 229, 96 S. Ct. 2532, 2540, 49 L. Ed. 2d 451, 462 (1976) (rejecting an approach to impose through the Due Process Clause "a nationwide rule mandating transfer hearings"); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 44, 93 S. Ct. 1278, 1302, 36 L. Ed. 2d 16, 49 (1973) (noting that "it would be difficult to imagine" a case with greater impact on the federal system if the Court would abrogate systems of financing public education); *Johnson v. Louisiana*, 406 U.S. 356, 375, 92 S. Ct. 1620, 1640, 32 L. Ed. 2d 152, 167 (1972) (Powell, J., concurring) (arguing that incorporating " 'jot-for-jot and case-for-case' every element of the Sixth Amendment" against the states would derogate "principles of federalism basic to our system"). The tendency of the United States Supreme Court to underenforce constitutional norms due to the national scope of the Court's opinions is recognized in the literature. *See, e.g., Developments in the Law—The Interpretation of State Constitutional Rights*, 95 Harv. L. Rev. 1324, 1351–60 (1982) (citing institutional differences, the need for national solutions, and sensitivities to federalism as tending to dilute federal constitutional rulings and compelling a cautious and conservative approach to rules while noting state judges are more politically responsive, states have a greater capacity for innovation, and state judiciaries are common law courts that are more used to policy analysis); Lawrence Gene Sager, *Fair Measure: The Legal Status of Underenforced Constitutional Norms*, 91 Harv. L. Rev. 1212, 1218–20 (1978); George C. Thomas III, *When Constitutional Worlds Collide: Resurrecting the Framers' Bill of Rights and Criminal Procedure*, 100 Mich. L. Rev. 145, 147–48 (2001) (noting the Court has never had the appetite to apply the provisions of the Federal Bill of Rights to the states as rigorously as it has applied them to the federal government). The tendency to dilute constitutional rules as a result of federalism concerns has been cited in a number of state court cases. *See, e.g., State v. Hunt*, 450 A.2d 952, 962 (N.J. 1982) (Pashman, J., concurring) (observing Supreme Court has been "hesitant to impose on a national level far-reaching constitutional rules binding on each and every state"); *Alderwood Assocs. v. Washington Envtl. Council*, 635 P.2d 108, 115 (Wash. 1981) (noting that rules in United States Supreme Court decisions "invariably represent[] the lowest common denominator").

in *Williams v. Florida*, 399 U.S. 78, 136, 90 S. Ct. 1893, 1925, 26 L. Ed. 2d 446, 474 (1970) (Harlan, J., dissenting), Justice Harlan noted that the decision to establish a six person jury "simply reflects the lowest common denominator in the scope and function of the right to trial by jury in this country." Finally, in a draft concurrence to *Johnson v. Louisiana*, 406 U.S. 356, 92 S. Ct. 1620, 32 L. Ed. 2d 152 (1972), and *Apodaca v. Oregon*, 406 U.S. 404, 92 S. Ct. 1628, 32 L. Ed. 184 (1972), that was never filed because of his intervening death, Justice Harlan wrote that incorporation threatened " 'to chill the Sixth Amendment out of existence' and 'might well spell the demise—under the inescapable pressures of federalism—of many other provisions of the Bill of Rights.' " Tinsely E. Yarbrough, *John Marshall Harlan: Great Dissenter of the Warren Court* 291 (1992) (internal quotation marks omitted).

In the period following the incorporation revolution ending with *Mapp*, there is no doubt the strength and scope of the Fourth Amendment's protection has been dramatically reduced by the United States Supreme Court. Pre-*Mapp*, there were a couple exceptions to the warrant requirement; post-*Mapp* there are nearly *two dozen* such exceptions. *California v. Acevedo*, 500 U.S. 565, 582–83, 111 S. Ct. 1982, 1992–93, 114 L. Ed. 2d 619, 636 (1991) (Scalia, J., concurring). The role of consent has been changed from its narrow characterization in *Bram v. United States*, 168 U.S. 532, 18 S. Ct. 183, 42 L. Ed. 568 (1897), and *Johnson v. Zerbst*, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), to its protean formulation in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). The strength of the exclusionary rule in *Weeks v. United States*, 232 U.S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914), has been substantially eroded by the "good faith

exception" to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984).

As a result, in implicit recognition of the difficulties arising from incorporation of the Bill of Rights into a national system of rules, the post-incorporation United States Supreme Court has repeatedly emphasized the ability of states to expand the scope of constitutional protections under their state constitutions. *See, e.g., California v. Greenwood*, 486 U.S. 35, 43, 108 S. Ct. 1625, 1630, 100 L. Ed. 2d 30, 39 (1988) ("Individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution."); *Michigan v. Mosley*, 423 U.S. 96, 120, 96 S. Ct. 321, 334, 46 L. Ed. 2d 313, 331 (1975) (Brennan, J., dissenting) (calling on states "to impose higher standards governing police practices under state law than [are] required by the Federal Constitution"); *Oregon v. Hass*, 420 U.S. 714, 719, 95 S. Ct. 1215, 1219, 43 L. Ed. 2d 570, 575 (1975) (repeating that "a State is free *as a matter of its own law* to impose greater restrictions . . . than those this Court holds to be necessary upon federal constitutional standards" (emphasis added)); *Cooper v. California*, 386 U.S. 58, 62, 87 S. Ct. 788, 791, 17 L. Ed. 2d 730, 734 (1967) (noting that Supreme Court holding "does not affect the State's power to impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so"). *See generally* Shirley S. Abrahamson, *Criminal Law and State Constitutions: The Emergence of State Constitutional Law*, 63 Tex. L. Rev. 1141, 1142 n.3 (1985) [hereinafter Abrahamson] (discussing cases). In 2008, Justice Scalia observed in *Virginia v. Moore*, 553 U.S. 164, 176, 128 S. Ct. 1598, 1607, 170 L. Ed. 2d 559, 571 (2008), that "States are free to regulate [warrantless] arrests however they desire."

Cumulatively, the realities in the post-incorporation era were as follows: the United States Supreme Court incorporated most of the Bill of Rights provisions of the United States Constitution against the states through the Due Process Clause of the Fourteenth Amendment, but as a result, federalism concerns exerted a new narrowing and restraining influence on the interpretation of federal civil liberties provisions. In the post-incorporation era, the United States Supreme Court repeatedly emphasized the ability of states to adopt more stringent protections under state constitutions.

**II. Status of Independent State Constitutional Law Today After Incorporation of the Bill of Rights.**

**A. Rebirth of Independent State Constitutional Law.** After incorporation, many state courts tended to follow or adopt the approach of the United States Supreme Court in interpretation of parallel provisions under state constitutions. This tendency to simply follow federal caselaw was in part due to the fact that federal law was more expansive than prior state constitutional law. Lawyers also often relied solely on federal constitutional law or regarded state and federal law as interchangeable in their advocacy in state courts. *See State Constitutions in the Federal System* at 49.

Beginning in the 1960s, however, a growing number of states began to rediscover the independent nature of their state constitutional provisions. Sometimes called the "new judicial federalism," the high courts of California, New York, New Jersey, Oregon, Washington, and Wisconsin were particularly active, followed by those of New Mexico, Indiana, Georgia, Ohio, Michigan, Connecticut, Minnesota, Utah,

Pennsylvania, and many other states.[9] The cases characterize the examination of independent state constitutional grounds by state courts not as some kind of aberration, but as a solemn duty. *See, e.g., Burling v. Chandler*, 804 A.2d 471, 476 (N.H. 2002) (per curiam) (recognizing that oath taken to honor state constitution makes it the justices' duty to apply the state constitution when it does not conflict with the Federal Constitution); *Commonwealth v. Gaffney*, 733 A.2d 616, 621 (Pa. 1999) (noting even when Federal Constitutional claim is discharged, supreme court must undertake independent analysis of Pennsylvania Constitution " 'each time a provision of that fundamental document is implicated' " (citation omitted)); *State v. Johnson*, 729 N.W.2d 182, 189 n.7 (Wis. 2007) (observing court's duty to examine state constitution independently even if conclusion does not differ from that under Federal Constitution).

As noted by Professor G. Alan Tarr more than a decade ago, the emphasis on the independent nature of state constitutions of the "new judicial federalism" is simply "no longer new." G. Alan Tarr, *The New Judicial Federalism in Perspective*, 72 Notre Dame L. Rev. 1097, 1098–99

---

[9]There is voluminous literature on the independent power of state judiciaries to construe provisions of their state constitutions. The most encyclopedic volume focusing on individual rights is Jennifer Friesen, *State Constitutional Law: Litigating Individual Rights, Claims, and Defenses* (4th ed. 2006). Three frequently cited surveys of state constitutional law are James A. Gardner, *Interpreting State Constitutions: A Jurisprudence of Function in a Federal System* (2005), G. Alan Tarr, *Understanding State Constitutions* (1998), and Robert F. Williams, *The Law of American State Constitutions* (2009). *See also New Frontiers of State Constitutional Law: Dual Enforcement of Norms* (James A. Gardner & Jim Rossi eds., 2011); Robert A. Schapiro, *Polyphonic Federalism: Toward the Protection of Fundamental Rights* (2009); Jeffrey M. Shaman, *Equality and Liberty in the Golden Age of State Constitutional Law* (2008); Michael E. Solimine & James L. Walker, *Respecting State Courts: The Inevitability of Judicial Federalism* (1999); G. Alan Tarr & Mary Cornelia Aldis Porter, *State Supreme Courts in State and Nation* (1988); *Toward a Usable Past: Liberty Under State Constitutions* (Paul Finkelman & Stephen E. Gottlieb eds., 1991). Many of the concepts in this opinion have been developed and elaborated upon by Robert F. Williams in *The Law of American State Constitutions* and Jennifer Friesen in *State Constitutional Law: Litigating Individual Rights, Claims, and Defenses*.

(1997). Contemporary courts and scholars have recognized and reaffirmed the historically well-established concepts that state constitutional provisions are independent of parallel provisions of the Federal Constitution and that state supreme courts may depart from existing federal precedent in reaching their conclusions regarding state constitutional law. There are textbooks,[10] monographs,[11] hundreds of law review articles,[12] and thousands of reported cases discussing the independent nature of state constitutional provisions.

---

[10]*See, e.g.*, Jennifer Friesen, *State Constitutional Law: Litigating Individual Rights, Claims, and Defenses* (4th ed. 2006) [hereinafter Friesen]; Randy J. Holland, Stephen R. McAllister, Jeffrey M. Shaman & Jeffrey S. Sutton, *State Constitutional Law: The Modern Experience* (2010); Robert F. Williams, *State Constitutional Law: Cases and Materials* (4th ed. 2006).

[11]*See* Tim J. Watts, *State Constitutional Law Development: A Bibliography* 3–5 (1991) (listing monographs published prior to 1991 on state constitutional law).

[12]*See id.* at 5–36 (listing over 400 articles published prior to 1991 on state constitutional grounds). A tiny sampling of the literature on state constitutional law dealing with the developments in specific states includes Charles W. Johnson & Scott P. Beetham, *The Origin of Article I, Section 7 of the Washington State Constitution*, 31 Seattle U. L. Rev. 431 (2008); Patty Jones, *Search and Seizure—Methodological Contention Results in Conflicting Authority When Deciding Similar State and Federal Constitutional Claims.* Commonwealth v. Shaw*, 770 A.2d 295 (Pa. 2001)*, 33 Rutgers L.J. 1462 (2002); Jack L. Landau, *The Search for the Meaning of Oregon's Search and Seizure Clause*, 87 Or. L. Rev. 819 (2008); Jack L. Landau, *Should State Courts Depart from the Fourth Amendment? Search and Seizure, State Constitutions, and the Oregon Experience*, 77 Miss. L.J. 369 (2007); Douglas Holden Wigdor, *What's in a Word? Comparative Analysis of Article I, § 12 of the New York State Constitution and the Fourth Amendment to the United States Constitution as Interpreted by the New York Court of Appeals and the United States Supreme Court*, 14 Touro L. Rev. 757 (2008); Colin M. Black, Note, *"Shooting an Elephant"—Massachusetts Maintains Reasonable Suspicion: Protecting Individual Privacy During Traffic Stops and Battling Racial Profiling*, 6 Suffolk J. Trial & App. Advoc. 215 (2001); Dennis J. Buffone, Note, *Traffic Stops, Reasonable Suspicion, and the Commonwealth of Pennsylvania: A State Constitutional Analysis*, 69 U. Pitt. L. Rev. 331 (2007); Richard C. Miller, Comment, *Begging to Defer: Lessons in Judicial Federalism from Colorado Search and Seizure Jurisprudence*, 76 U. Colo. L. Rev. 865 (2005); and Kenneth F. Kirwin, *Minnesota's Constitution: An Essential Tool in Search and Seizure Cases*, 65 Bench & Bar Minn., Nov. 1, 2008, at 29.

The development of independent state constitutional law has not always been a smooth process. A number of state supreme courts have expressed frustration with lawyers who have failed to advance state constitutional arguments. In order to encourage proper advocacy, a number of state supreme courts have published what are referred to in the literature as "teaching opinions," which review the rationale for independent state constitutional grounds. *See, e.g., Friedman v. Comm'r of Pub. Safety*, 473 N.W.2d 828 (Minn. 1991); *Davenport v. Garcia*, 834 S.W.2d 4 (Tex. 1992); *State v. Jewett*, 500 A.2d 233 (Vt. 1985); *Dworkin v. L.F.P., Inc.*, 839 P.2d 903 (Wyo. 1992). *See generally* Robert F. Williams, *The Law of American State Constitutions* 144–46 (2009) [hereinafter Williams]. *Dworkin* is a particularly striking example because the Wyoming Supreme Court attached a bibliography of articles on independent state constitutional development as an appendix to the opinion. 839 P.2d at 920–22.

In light of the availability of state constitutional claims and the complete lack of any strategic reason not to pursue them, a number of state court judicial opinions indicate the failure to bring a state constitutional claim may amount to malpractice. *See State v. Lowry*, 667 P.2d 996, 1013 (Or. 1983) (Jones, J., concurring) ("Any defense lawyer who fails to raise an Oregon Constitution violation and relies solely on parallel provisions under the federal constitution . . . should be guilty of legal malpractice."); *Commonwealth v. Kilgore*, 719 A.2d 754, 757 (Pa. Super. Ct. 1998) (finding counsel ineffective for failure to raise state search and seizure claim); *Jewett*, 500 A.2d at 235 (noting that legal argument too often "consists of a litany of federal buzz words memorialized like baseball cards"). As bluntly stated by Judge Jeffrey S. Sutton of the United States Court of Appeals for the Sixth Circuit, "no

lawyer worth his or her salt can be a good advocate in today's world without appreciating the possibility—and value—of raising state and federal [constitutional] claims in representing a client." Jeffrey S. Sutton, *Why Teach—and Why Study—State Constitutional Law*, 34 Okla. City U. L. Rev. 165, 178 (2009) [hereinafter Sutton]; *see also State Constitutions in the Federal System* at 70 ("Local practitioners have an obligation to raise the issue that the state court can grant broader protection under its own constitution[.]"). *See generally* 1 Friesen § 1.08, at 1–57 to 1–66 (suggesting a manner by which to raise and argue independent state constitutional grounds).

Yet, as observed in an introduction to a conference on state constitutional law developments almost thirty years ago, "[o]ld habits die hard." A. E. Dick Howard, *Introduction: A Frequent Recurrence to Fundamental Principles, in Developments in State Constitutional La*w xi, xxii (Bradley D. McGraw ed., 1985). According to the 1989 report of the Advisory Commission on Intergovernmental Relations, "Even among lawyers, state constitutional law is relatively unknown and little practiced." *State Constitutions in the Federal System* at 2.

In order to help remedy the situation, the Conference of Chief Justices in 2010 passed a resolution urging all law schools to offer a course in state constitutional law. Robert F. Williams, *Why State Constitutions Matter*, 45 New Eng. L. Rev. 901, 909, 912 (2011) (reproducing text of resolution as an appendix). The resolution stated, among other things, that state constitutional "declarations of rights . . . are often greater than federally guaranteed rights and liberties" and that "being a competent and effective lawyer requires an understanding of both the Federal Constitution and state constitutional law." *Id.* at app.

An important feature of independent state constitutional law is that it is not "liberal" or "conservative."[13]  Rather, state constitutional law involves recognition of the independent nature of state constitutions and the obligation of state courts in our federal system.  *See* Barry Latzer, *Whose Federalism? Or, Why "Conservative" States Should Develop Their State Constitutional Law,* 61 Alb. L. Rev. 1399, 1403–10 (1998).  *See generally Stanely Mosk, State Constitutionalism: Both Liberal and Conservative,* 63 Texas L. Rev. 1081 (1985).  While labels are illusive—is our evolving search and seizure jurisprudence, liberal, conservative, or libertarian?—independent state constitutional analysis can yield outcomes that might appeal to persons who regard themselves as politically "conservative."  Certainly the result in *Tonn* favored the state over criminal defendants.  And, in the wake of the United States Supreme Court decision in *Kelo v. City of New London,* 545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005), the Ohio Supreme Court, on independent state grounds, provided greater protection to property rights under the Ohio Constitution than were provided by the United States Supreme Court.  *Norwood v. Horney,* 853 N.E. 2d 1115, 1123, 1128–42

---

[13]The New Judicial Federalism is often associated with a seminal law review article written by Justice William Brennan in which Justice Brennan urged state courts to provide more constitutional protections for individuals than was being provided by the United States Supreme Court.  *See* William J. Brennan, Jr., *State Constitutions and the Protections of Individual Rights*, 90 Harv. L. Rev. 489 (1977).  As pointed out by Indiana Chief Justice Randall Shepard, however, scholars and judges were advocating independent state constitutional development well before Justice Brennan's argument appeared.  Randall T. Shepard, *The Maturing Nature of State Constitution Jurisprudence*, 30 Val. U. L. Rev. 421, 423–24 & n.9 (1996) (citing Vern Countryman, *Why a State Bill of Rights?* 45 Wash. L. Rev. 454 (1970), Jerome B. Falk, Jr., *Foreword: The State Constitution: A More than "Adequate" Nonfederal Ground*, 61 Cal. L. Rev. 273 (1973), Robert Force, *State "Bills of Rights": A Case of Neglect and the Need for a Renaissance*, 3 Val. U. L. Rev. 125 (1969), *Project Report: Toward an Activist Role for State Bills of Rights*, 8 Harv. C.R.-C.L. L. Rev. 271 (1973), and Lawrence M. Newman, Note, *Rediscovering the California Declaration of Rights*, 28 Hastings L.J. 481 (1974)).

(Ohio 2006). Additionally, the New Hampshire Supreme Court found under its state equal protection clause that the right to enjoy property is subject to intermediate scrutiny. *Cmty. Res. for Justice, Inc. v. City of Manchester*, 917 A.2d 707, 717–21 (N.H. 2007); *see also* Timothy Sandefur, *Don't Mess with Property Rights in Texas: How the State Constitution Protects Property Owners in the Wake of* Kelo, 41 Real Prop. Prob. & Tr. J. 227, 228–30, 252 (2007) (arguing the Texas Constitution's public use clause provides more protection to property owners than the United States Constitution).

The rebirth of state constitutional law has advanced constitutional dialogue both horizontally and vertically within the federal system. Consistent with Justice Louis Brandeis's famous declaration that a state in the federalist system amounts to a "laboratory" of democracy, *see New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S. Ct. 371, 386–87, 76 L. Ed. 747, 771 (1932) (Brandeis, J., dissenting), the vibrancy of state constitutional law has been a salutary development in promoting horizontal federalism, or dialogue among the states. *See* Robert F. Williams, *State Constitutional Methodology in Search and Seizure Cases,* 77 Miss. L.J. 225, 253 (2007) [hereinafter *State Constitutional Methodology*]; *see also* Ronald K.L. Collins, *Reliance on State Constitutions: Some Random Thoughts*, 54 Miss. L.J. 371, 409 (1984) [hereinafter Collins]. Just as a state court exploring products liability in the 1950s would certainly consult Justice Roger Traynor's concurring opinion in *Escola v. Coca Cola Bottling Co.*, 150 P.2d 436, 461 (Cal. 1944) (Traynor, J., concurring), state supreme courts consult the cases of other states in developing their own state constitutional law. Collins, 54 Miss. L.J. at 408. For example, in *Tonn*, we canvassed academic authorities, dissenting federal authorities, and the law of other state supreme courts.

*See* 195 Iowa at 103–09, 191 N.W. at 534–36.  Similarly, in *Cline, Ochoa,* and *Pals,* we canvassed cases from other states to determine the best result on search and seizure questions under the Iowa Constitution. *Pals*, 805 N.W.2d at 775–77, 779; *Ochoa,* 792 N.W.2d at 283–84; *Cline,* 617 N.W.2d at 289–90.  With computer-based legal research, state supreme court justices and their clerks have ready access to recent state constitutional analyses in other states that can serve as a springboard for analysis.  The cross-fertilization opportunities in the development of state constitutional law has never been greater.  *See State Constitutional Methodology*, 77 Miss. L.J. at 253 (stating that "state courts are remiss" if they do not use modern research methods to look at decisions of other state courts).

The growth of independent state constitutional law also promotes vertical federalism, or a constitutional dialogue between state and federal courts regarding the proper interpretation of an open-textured constitutional provision.  *See* James A. Gardner, *Interpreting State Constitutions: A Jurisprudence of Function in a Federal System* 100 (2005) [hereinafter Gardner].[14]  In this regard, commentators have cited our century old case of *State v. Sheridan,* 121 Iowa 164, 96 N.W. 730 (1903), as a precursor to the adoption of the exclusionary rule by the United States Supreme Court in *Weeks.  See, e.g.,* Joseph Blocker, *Reverse*

---

[14]According to Professor Gardner, state court rejection of United States Supreme Court decisions under state constitutions can ultimately influence opinion on the correctness of the Supreme Court decision, contribute to a state-level nationwide consensus, sometimes considered by the United States Supreme Court, provide a check on national power by prohibiting state and local governments from exercising power granted to them under the United States Constitution, and curb harm to civil liberties brought about by narrow United States Supreme Court rulings.  This section of Gardner's book is a substantial reproduction of an article he published two years earlier in the Georgetown Law Journal.  *See* James A. Gardner, *State Constitutional Rights as Resistance to National Power*, 91 Geo. L.J. 1003, 1032–54 (2003).

*Incorporation of State Constitutional Law,* 84 S. Cal. L. Rev. 323, 372 n.255 (2011); Collins, 54 Miss. L.J. at 415; *see also* G. Alan Tarr, *Understanding State Constitutions* 163 n.119 (1998) [hereinafter *Tarr*]. When the United States Supreme Court incorporated the exclusionary rule against the states in *Mapp,* it noted a majority of states had already adopted it. 367 U.S. at 651, 81 S. Ct. at 1689, 6 L. Ed. 2d at 1087–88.

State supreme court decisions have also impacted the permissible scope of warrantless searches incident to lawful arrests in the automobile context. In *New York v. Belton,* 453 U.S. 454, 460, 101 S. Ct. 2860, 2864, 69 L. Ed. 2d 768, 775 (1981), the United States Supreme Court held law enforcement officers could conduct thorough vehicle searches, incident to arrest, including inside closed containers. In the aftermath, a number of state supreme courts rejected *Belton*'s reasoning when interpreting parallel state constitutional provisions. *See, e.g., State v. Hernandez,* 410 So. 2d 1381, 1384–85 & n.2 (La. 1982); *State v. Harnisch,* 954 P.2d 1180, 1182–83 (Nev. 1998); *State v. Pierce,* 642 A.2d 947, 959–60 (N.J. 1994); *State v. Rowell,* 188 P.3d 95, 101 (N.M. 2008); *People v. Blasich,* 541 N.E.2d 40, 44–45 (N.Y. 1989); *Commonwealth v. White,* 669 A.2d 896, 902 (Pa. 1992); *State v. Bauder,* 924 A.2d 38, 46–47 (Vt. 2007); *State v. Stroud,* 720 P.2d 436, 440–41 (Wash. 1986) (plurality opinion), *overruled on other grounds by State v. Valdez,* 224 P.3d 751, 775–78 (Wash. 2009); *Vasquez v. State,* 990 P.2d 476, 488–89 (Wyo. 1999); *see also Commonwealth v. Toole,* 448 N.E.2d 1264, 1266–68 (Mass. 1983) (rejecting *Belton* based on state statute). These courts demonstrated respect for the United States Supreme Court, but nonetheless strongly disagreed with its reasoning. Ultimately, the United States Supreme Court abandoned much of *Belton,* citing among other things the developments in the states. *See Arizona v. Gant,* 556 U.S.

322, 338, 129 S. Ct. 1710, 1716, 173 L. Ed. 2d 485, 493 (2009). *See generally State v. Vance*, 790 N.W.2d 775, 786–90 (Iowa 2010).

State high court rulings interpreting state constitutions have paved the way for the United States Supreme Court in a number of other areas. *See generally* Joseph Blocher, *Reverse Incorporation of State Constitutional Law*, 84 S. Cal. L. Rev. 323, 371–85 (2011) (discussing the influence of state constitutional law in criminal procedure, due process, and Eight Amendment cases). For instance, the California Supreme Court ruling regarding miscegenation in *Perez v. Lippold*, 198 P.2d 17 (Cal. 1948), was a precursor to the United States Supreme Court decision in *Loving v. Virginia*, 388 U.S. 1, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967). William B. Rubenstein, *The Myth of Superiority*, 16 Const. Comment. 599, 622 n.91 (1999). Similarly, the decision of the Georgia Supreme Court under the Georgia Constitution to prohibit the criminalization of same-sex sodomy in *Powell v. State*, 510 S.E.2d 18 (Ga. 1998), contributed to the overruling of *Bowers v. Hardwick*, 478 U.S. 186, 106 S. Ct. 2841, 92 L. Ed. 2d 140 (1986). *Lawrence v. Texas*, 539 U.S. 558, 576, 123 S. Ct. 2472, 2483, 156 L. Ed. 2d 508, 524 (2003) (specifically citing *Powell* as an example of a state court's decision to depart from *Bowers* under its state constitution).[15] *See generally* Gardner at 100–03 (providing overview of the Georgia decision in *Powell* and subsequent reaction). Further, the California Supreme Court in *People v. Wheeler*, 583 P.2d 748, 761–62 (Cal. 1978), held the use of a preemptory challenge to remove a juror based on the juror's membership in a particular racial, religious, or ethnic group violates the California

---

[15]Prior to *Bowers v. Hardwick*, we held that a criminal statute prohibiting opposite-sex sodomy in private violated the federal right of privacy. *See State v. Pilcher*, 242 N.W.2d 348, 359 (Iowa 1976).

Constitution. This decision predated the same conclusion by the United States Supreme Court under the United States Constitution in *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719, 90 L. Ed. 2d 69, 82–83 (1986).

The dialogic nature of state constitutional law—both vertical and horizontal—is highly desirable and should cause celebration, not handwringing. *See* Jason Mazzone, *The Bill of Rights in the Early State Courts*, 92 Minn. L. Rev. 1, 6 (2007) [hereinafter Mazzone] (stating that "[a]llowing state courts to adopt more expansive readings of constitutional rights generates information about how rights might be structured" and that "[s]uch experimentation produces systemic benefits"); Lawrence Gene Sager, *Fair Measure: The Legal Status of Underenforced Constitutional Norms*, 91 Harv. L. Rev. 1212, 1251–52 (1978) (noting many reforms of the Warren court were already well-established matters of state law in a number of states). The interactions fostered by the rebirth of independent state constitutional law demonstrate that the system of dual sovereignty is now functioning more closely to the federalist ideal.

**B. Independent Iowa State Constitutional Law After Incorporation.** After incorporation, the first requirement, of course, was to ensure that Iowa law provided the floor of protection offered by the United States Constitution in criminal procedure, including the Fourth Amendment. Immediately following incorporation, we primarily adjusted to the incorporation revolution under the Warren Court and our caselaw under the Iowa Constitution tended to run parallel to the evolving federal caselaw. *See Ochoa*, 792 N.W.2d at 265–66 (discussing older Iowa cases).

As the United States Supreme Court began to scale back on substantive holdings under the Bill of Rights of the United States Constitution, we on a number of occasions took a different path under our state constitution. We have applied independent Iowa state constitutional law in the areas of equal protection, *see, e.g., Varnum v. Brien*, 763 N.W.2d 862, 896 (Iowa 2009); *Racing Ass'n of Cent. Iowa v. Fitzgerald (RACI)*, 675 N.W.2d 1, 7 (Iowa 2004); *Bierkamp v. Rogers*, 293 N.W.2d 577, 579 (Iowa 1980), cruel and unusual punishment, *see State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009), due process, *see State v. Cox*, 781 N.W.2d 757, 761 (2010); *Callender v. Skiles*, 591 N.W.2d 182, 187, 189 (Iowa 1999), and search and seizure, *see Pals*, 805 N.W.2d at 782; *Ochoa*, 792 N.W.2d at 267; *State v. Tague*, 676 N.W.2d 197, 204, 206 (Iowa 2004); *Cline*, 617 N.W.2d at 284–85; *State v. Cullison*, 173 N.W.2d 533, 538–39 (Iowa 1970).

Of course, we are free to follow persuasive United States Supreme Court precedent in the interpretation of state constitutional provisions. For example, in *State v. Breuer*, 808 N.W.2d 195, 201–03 (Iowa 2012), we followed persuasive federal precedent and declined to require that a search warrant be physically present in a hospital room before police may obtain a blood draw from a person suspected of driving while intoxicated. Even where we have declined to take a different path under the Iowa Constitution, however, we have respectively emphasized that we jealously guard our right to do so. *See, e.g., State v. Becker*, 818 N.W.2d 135, 149 (Iowa 2012); *State v. Kurth*, 813 N.W.2d 270, 283 (Iowa 2012) (Appel, J., concurring specially); *Hensler v. City of Davenport*, 790 N.W.2d 569, 579 n.1 (Iowa 2010); *Zaber v. City of Dubuque*, 789 N.W.2d 634, 654 (Iowa 2010); *Dykstra v. Iowa Dist. Ct.*, 783 N.W.2d 473, 480 (Iowa 2010); *State v. Wilkes*, 756 N.W.2d 838, 842 n.1 (Iowa 2008); *In re Det. of*

*Hennings*, 744 N.W.2d 333, 337 (Iowa 2008); *State v. Hoskins*, 711 N.W.2d 720, 725 (Iowa 2006); *State v. Beckett*, 532 N.W.2d 751, 755 (1995); *State v. Groff*, 323 N.W.2d 204, 207–08 (Iowa 1982); *State v. Olsen*, 293 N.W.2d 216, 219–20 (Iowa 1980).

One of the questions we have faced in developing our independent state constitutional law was whether an opinion of the United States Supreme Court under the provision of the United States Constitution was entitled to a "presumption of correctness" in the interpretation of a parallel or similar provision of the Iowa Constitution. In *Ochoa,* we declared, among other things, that there is no presumption that the federal law is the correct approach. 792 N.W.2d at 267. We came to the same conclusion as Oregon Supreme Court Justice Hans Linde, who three decades ago described a state court's blind adoption of federal constitutional doctrine when interpreting its state constitution as a "non sequitur that the United States Supreme Court's decisions under such a text not only deserve respect but presumptively fix its correct meaning also in state constitutions." *State v. Kennedy*, 666 P.2d 1316, 1322 (Or. 1983). Our view also aligned with leading commentators. As noted by Professor Robert F. Williams, the premise that United States Supreme Court interpretations of the Bill for Rights of the United States Constitution are presumptively correct for interpreting analogous provisions of state constitutions is "simply wrong." Williams at 135; s*ee also* Dorothy T. Beasley, *The Georgia Bill Of Rights: Dead or Alive*, 34 Emory L.J. 343, 414 (1985) ("The virtual piggybacking of the state clause onto the federal clause renders the former a parasite instead of an independent source of authority."). According to Professor Williams, a state court interpreting its state constitution should give less weight to United States Supreme Court decisions than the decisions of other states

interpreting similar provisions because "federalism and other institutional concerns, either explicitly or implicitly, pervade Supreme Court decisions declining to recognize rights *against states*." Williams at 137. Williams accordingly discounts these decisions because of the possibility of underenforcement of the Bill of Rights of the United States Constitution. *Id.* Otherwise, as indicated by Justice David Souter, then of the New Hampshire Supreme Court, state courts would be reduced to "a mere row of shadows." *State v. Bradberry*, 522 A.2d 1380, 1389 (N.H. 1986) (Souter, J., concurring specially).

To date, we have yet to adopt the primacy approach to state constitutional law. Under the primacy approach, a state supreme court addresses state constitutional issues before moving to issues under the Federal Constitution. *See, e.g.*, *State v. Cadman*, 476 A.2d 1148, 1150 (Me. 1984); *State v. Weeks*, 635 A.2d 439, 445–46 (N.H. 1993), *abrogated on other grounds by State v. Knickerbocker*, 880 A.2d 419, 423 (N.H. 2005); *Sterling v. Cupp*, 625 P.2d 123, 126 (Or. 1981).[16] The primacy approach has the desirable feature of avoiding unnecessary federal constitutional adjudications and in obtaining finality. Jerome B. Falk, Jr., *Foreword: The State Constitution: A More than "Adequate" Nonfederal Ground*, 61 Cal. L. Rev. 273, 286 (1973); *see also State Constitutions in the Federal System* at 70 (characterizing primacy approach as "useful" because it avoids unnecessary federal adjudications, allows state courts to decide questions of state law, takes pressure off the United States Supreme Court, promotes consideration of the character of a state, and promotes state experimentation). Though only adopted by a few courts,

---

[16]The leading advocate of this approach was Justice Hans Linde of the Oregon Supreme Court. *See* Hans A. Linde, *Without "Due Process": Unconstitutional Law in Oregon*, 49 Or. L. Rev. 125, 133–35 (1970) [hereinafter Linde].

and then perhaps honored in the breach more than followed,[17] the primacy approach has had the support of Justice Linde[18] as well as United States Supreme Court Justice John Paul Stevens.[19]  As noted by Justice Stevens:

> The emerging preference for state constitutional bases of decision in lieu of federal ones is, in my view, the analytic approach best suited to facilitating the independent role of state constitutions and state courts in our federal system.

*Delaware v. Van Arsdall,* 475 U.S. 673, 705, 106 S. Ct. 1431, 1448–49, 89 L. Ed. 2d 674, 699 (1986) (Stevens, J., dissenting).

Instead, we have adopted a more measured approach under which we are free to consider either state or federal constitutional provisions first.  For instance, in *Cox* and *Tague*, we elected to address the state constitutional issues involving due process and search and seizure first, leaving the federal constitutional issues undecided.  *Cox,* 781 N.W.2d at 772; *Tague,* 676 N.W.2d at 206.  On the other hand, in *Mitchell County v. Zimmerman,* 810 N.W.2d 1, 18 (Iowa 2012), and *Kurth,* 813 N.W.2d at 281, we addressed federal constitutional issues in a cases involving religious liberty and search and seizure, respectively, and reserved state constitutional questions.  By exercising our discretion regarding which

---

[17]*See* John W. Shaw, Comment, *Principled Interpretations of State Constitutional Law—Why Don't the "Primacy" States Practice What They Preach?,* 54 U. Pitt. L. Rev. 1019, 1034–49 (1993) (noting, following analysis of Oregon cases, that the Oregon Supreme Court often departs from the primacy approach and offering explanations).

[18]*See* Linde, 49 Or. L. Rev. at 135.

[19]*See Brigham City v. Stuart,* 547 U.S. 398, 407–08, 126 S. Ct. 1943, 1950, 164 L. Ed. 2d 650, 660 (2006) (Stevens, J., concurring); *Delaware v. Van Arsdall,* 475 U.S. 673, 705, 106 S. Ct. 1431, 1448–49, 89 L. Ed. 2d 674, 699 (1986) (Stevens, J., dissenting); *Massachusetts v. Upton,* 466 U.S. 727, 736–37, 104 S. Ct. 2085, 2089–90 80 L. Ed. 2d 721, 729–30 (1984) (Stevens, J., concurring).

claim to address first, we can choose the clearest path to the resolution of a case.

Our approach to independent state constitutional law in the search and seizure area has been cautious. We have required that state constitutional grounds must be properly before the court, sometimes strictly enforcing our preservation rules. For example, in *State v. Lowe*, 812 N.W.2d 554, 577 (Iowa 2012), the majority of this court declined to consider whether we should adopt a *Johnson v. Zerbst*-type knowing and voluntary requirement for a consent search under article I, section 8 of the Iowa Constitution because the parties did not specifically raise the argument. When a party argues from federal caselaw but does not assert a different substantive standard under the Iowa Constitution, we ordinarily decline to develop a new standard, but reserve the power to apply the federal standard in a manner different from federal caselaw. *See, e.g., Bruegger*, 773 N.W.2d at 883; *RACI*, 675 N.W.2d at 6–7. The distinction between a standard and its application is especially important where the legal principles have high degrees of generality, such as "totality of circumstances" tests, tests based upon "gross proportionality," and tests based upon "reasonableness." *See* Williams at 169–71; Jeffrey Sutton, *What Does—and Does Not—Ail State Constitutional Law*, 59 U. Kan. L. Rev. 687, 707 (2011) [hereinafter Sutton].

In part because of our relatively stringent preservation rules, the Iowa caselaw in the area of search and seizure involving independent state grounds has been modest. In *Cline,* we joined a minority of state jurisdictions rejecting the "good faith" exception to the exclusionary rule announced by the United States Supreme Court in *Leon. Cline*, 617 N.W.2d at 293. In *Tague,* we held that an isolated incident of crossing

the centerline did not provide probable cause or reasonable suspicion for a traffic stop under article I, section 8 of the Iowa Constitution. 676 N.W.2d at 206. We have also rejected the sweeping notion of *Samson v. California*, 547 U.S. 843, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006), that general searches of parolees may be conducted without any showing of particularity. *See Ochoa*, 792 N.W.2d at 291. We have insisted on a more realistic analysis of what amounts to "voluntary consent" in the context of automobile searches. *Pals*, 805 N.W.2d 782–83.

Each of our independent search and seizure cases has been narrowly crafted, reflecting a cautious approach to the development of our state constitutional law. Our independent search and seizure cases emphasize the traditional requirement of particularity to cabin government discretion in the search and seizure context and engage in realistic assessment of the voluntariness of consent. These two themes merge to remind law enforcement of the wisdom in the jurisprudence of United States Supreme Court Justice Potter Stewart: when in doubt, get a warrant. *See Mincey v. Arizona*, 437 U.S. 385, 390, 98 S. Ct. 2408, 2412, 57 L. Ed. 2d 290, 298–99 (1978) (reminding us that "it is a cardinal principal that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions' " (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576, 585 (1967) (footnotes omitted))). In short, we have sought to develop an Iowa search and seizure jurisprudence that prevents arbitrary exercise of government power in a realistic way in today's world.

**C. Challenges to Independent State Constitutional Law by Constitutional Nationalists.**

1. *Introduction.* During the past forty years, "constitutional nationalists"[20] have challenged the development of independent state constitutional law. Writing in 1998, a leading commentator declared that the concerns of constitutional nationalists had "largely been put to rest." Tarr at 169. While the paths pursued below have been well traveled by courts and commentators, some of the objections of the constitutional nationalists to a robust federalist system with vibrant independent state constitutional law should be put to rest.

2. *Parallel language.* Constitutional nationalists sometimes suggest that because the Fourth Amendment text and the text of the search and seizure provisions of state constitutions, like article I, section 8 of the Iowa Constitution, are nearly identical, state courts must follow the interpretive decisions of the United States Supreme Court. We have previously addressed and rejected this argument. *See, e.g.*, *Ochoa*, 792 N.W.2d at 267; *Tonn,* 195 Iowa at 104–07, 191 N.W. at 535–36.

The *Tonn–Ochoa* notion that parallel language in a state constitution is not tied to United States Supreme Court interpretations was recently powerfully endorsed by Judge Sutton:

> There is no reason to think, as an interpretive matter, that constitutional guarantees of independent sovereigns, even guarantees with the same or similar words, must be construed the same. Still less is there reason to think that a highly generalized guarantee, such as prohibition on "unreasonable" searches, would have just one meaning for a range of differently situated sovereigns.

Sutton, 59 U. Kan. L. Rev. at 707. Many state courts reflect Judge Sutton's approach. *See, e.g.*, *State v. Gerschoffer*, 763 N.E.2d 960, 965

---

[20]"Constitutional nationalists" are those who object to citation to foreign law. Daniel A. Farber, *The Supreme Court, the Law of Nations, and Citations of Foreign Law: The Lessons of History*, 95 Cal. L. Rev. 1335, 1342 (2007).

(Ind. 2002) (noting that Indiana Constitution "has unique vitality, even where its words parallel federal language"); *People v. Barber*, 46 N.E.2d 329, 331 (N.Y. 1943) (noting that New York Court of Appeals is "bound to exercise its independent judgment and is not bound by a decision of the Supreme Court of the United States limiting the scope of similar guarantees in the Constitution of the United States"); *State v. Arrington*, 319 S.E.2d 254, 260 (N.C. 1984) ("In construing provisions of the Constitution of North Carolina, this Court is not bound by opinions of the Supreme Court of the United States construing even identical provisions in the Constitution of the United States."); *Commonwealth v. Edmunds*, 586 A.2d 887, 895–96 (Pa. 1991) ("Although the wording of the Pennsylvania Constitution is similar in language to the Fourth Amendment of the United States Constitution, we are not bound to interpret the two provisions as if they were mirror images, even where the text is similar or identical."); *O'Boyle v. State*, 117 P.3d 401, 408 (Wyo. 2005) (search and seizure provision of Wyoming Constitution, which parallels the Fourth Amendment, provides "a separate and independent source of protection of the rights of Wyoming citizens").

The notion that state supreme courts should simply mirror the interpretations of the United States Supreme Court in interpreting parallel provisions of state constitutions is a flawed method of judging. This technique amounts to what Professor Adrian Vermeule refers to as "a precommitment device" that prevents a state supreme court from considering each case based on an independent examination of facts and law. *See* Adrian Vermeule, *The Judicial Power in the State (and Federal) Courts*, 2000 Sup. Ct. Rev. 357, 366 (2000); *see also* Williams at 226.

As a result, lockstepping state law to federal precedents is not a humble or minimalist approach, but is an aggressive and maximalist

approach to the law. Williams at 224–29.[21] Through the imposition of lockstep, constitutional nationalists seek not only to provide the rule of decision in a particular case, but in literally hundreds of cases in one master stroke. Lockstepping is the antithesis of the ordinary judicial method, which grinds more slowly and finely, decides what needs to be decided and no more, reserving future legal questions for the next case. As noted by two scholars, "Judicial federalism offers the opportunity to weigh alternatives over time, to keep an open mind, to reflect, and to develop visions of the good, without rushing headlong into the straitjacket of national policy." Michael E. Solimine & James L. Walker, *Respecting State Courts: The Inevitability of Judicial Federalism* 138 (1999) [hereinafter Solimine & Walker].

3. *Uniformity.* The development of independent state constitutional law is sometimes challenged on the pragmatic ground that it tends to defeat the development of uniform standards that apply under both the Federal and State Constitutions. The decision against uniformity, however, was made by the framers of the United States Constitution and the Iowa Constitution in favor of dual sovereignty. We have no authority to alter it. *See, e.g., State v. Smith*, 814 P.2d 652, 661 (Wash. 1991) (Utter, J., concurring) (noting that lockstepping would require rewrite of state constitution). We cannot add a proviso to the Tenth Amendment that declares, "State courts should defer to federal court interpretations of Bill of Rights provisions," nor can we add a provision to article I, section 8 of the Iowa Constitution declaring, in the

---

[21]This section of Williams's book consists of a substantial reproduction of an article he published in the William and Mary Law Review. *See* Robert F. Williams, *State Courts Adopting Federal Constitutional Doctrine: Case-by-Case Adoptionism or Prospective Lockstepping*, 46 Wm. & Mary L. Rev. 1499, 1520–27 (2005).

interest of uniformity, that we will decline to exercise our independent authority to interpret the state constitution.[22]   Demands for a uniform approach undermine the "double security" that Madison proclaimed the states provided in the federal framework.  *See Duncan*, 391 U.S. at 173, 88 S. Ct. at 1461, 20 L. Ed. 2d at 509–10 (Harlan, J., dissenting) (federalism protects "the security of liberty in America . . . [through] the dispersion of governmental power across a federal system"); *see also State v. von Bulow*, 475 A.2d 995, 1019 (R.I. 1984) (finding search without a warrant unlawful and commenting that state and federal constitutions provide a "double barrelled source of protection" (citation and internal quotation marks omitted)); 1 Friesen § 1.03[4][a], at 1–14 to 1–15 (noting that independent state constitutional analyses lead to "a net gain in liberty," that uniformity deprives states of sovereignty and local control, and that uniformity is illusory because it is impossible for the United States Supreme Court to review every case applying federal constitutional law); Stanley G. Feldman & David L. Abney, *The Double Security of Federalism: Protecting Individual Liberty Under the Arizona Constitution*, 20 Ariz. St. L.J. 115, 117 (1988) ("If we choose to follow federal precedent to bolster nationwide conformity, we destroy the 'double security' designed to protect our citizens."); Mazzone, 92 Minn. L. Rev. at 5–6, 74 (arguing consolidation of constitutional law is "inconsistent with federalism" because "federalism works best when different political unitys are able to try different approaches and solve problems in different ways").

---

[22]*See* Tarr at 181 (stating that in a system of dual sovereignty, state courts cannot legitimately delegate responsibility to interpret state constitutional provisions to the United States Supreme Court).

Indeed, the United States Supreme Court has held that the United States Constitution prohibits the federal government from commandeering a state legislature or a state executive and making them foot soldiers in the creation and enforcement of federal law. *See, e.g., Printz v. United States*, 521 U.S. 898, 935, 117 S. Ct. 2365, 2384, 138 L. Ed. 2d 914, 944 (1997) (invalidating provisions of Brady Handgun Violence Prevention Act because United States Constitution prohibits requiring state executive officials from enforcing federal law); *New York v. United States*, 505 U.S. 144, 180–83, 112 S. Ct. 2408, 2430–32, 120 L. Ed. 2d 120, 153–55 (1992) (invalidating environmental law provision that commandeered state legislature); *see also* Mazzone, 92 Minn. L. Rev. at 75–76 (arguing consolidation of constitutional law fails to respect the importance placed upon state courts by the United States Constitution). Similarly, state courts cannot become stone breakers pursuant to some kind of self-imposed corvée duty that requires federal precedent to be used as hammers to break state constitutional rock.

Further, even on a pragmatic level, the case for uniformity is unpersuasive. First, it would defeat the positive features of the federalist system which was so important to the founding generation. As one commentator has noted:

> Rules that govern relations between police officers and local citizens, or between cities and school boards and their employees, are not necessarily better decided, or more efficiently decided, by nine judicial appointees with a national responsibility and allegiance. Insisting on a national, uniform legal culture ignores the reality and richness of state differences.

1 Friesen § 1.03[4][a], at 1–14 to 1–15 (footnote omitted).

The position of state supreme court justices closer to daily law enforcement activities has not been lost on the United States Supreme

Court.  For instance, Justice Ginsberg has noted that state courts have a "unique vantage point" in automobile stop cases.  *See Ohio v. Robinette*, 519 U.S. 33, 40, 117 S. Ct. 417, 422, 136 L. Ed. 2d 347, 355 (1996) (Ginsburg, J., concurring).

Moreover, it is clear that uniformity will not be achieved by adopting United States Supreme Court precedents under the state constitution.  *See* 1 Friesen § 1.03[4][a], at 1–15.  The Supreme Court is capable of handling only a few search and seizure cases each year.  As a result, there are many issues dividing the federal circuits that remain undecided.  A recent survey of search and seizure precedents in the federal circuits reveal over three dozen current splits that have not been mediated by the United States Supreme Court.  *See* Wayne A. Logan, *Constitutional Cacophony: Federal Circuit Splits and the Fourth Amendment*, 65 Vand. L. Rev. 1137, 1147–60 (2012); *see also* John Harrison, *Federal Appellate Jurisdiction Over Questions of State Law in State Courts*, 7 Green Bag 2d 353, 356 (2004) (noting that "[f]ederal law is notoriously non-uniform among the different circuits"); Mazzone, 92 Minn. L. Rev. at 74–75 (warning not to overvalue uniformity because "our legal system tolerates a good deal of inconsistency and nonuniform outcomes"); Michael E. Solimine, *The Future of Parity*, 46 Wm. & Mary L. Rev. 1457, 1483 (2004) (explaining that "[e]ven narrowly focused federal rights often have nonuniform application").

In addition, past cases demonstrate that it is difficult to determine the methodology that the United States Supreme Court will apply to determine a search and seizure issue.  In recent years, the Supreme Court has applied at least five different analytical models, based upon the warrant requirement, individualized suspicion, case-by-case analysis, a balancing test, and an approach relying on the common law plus

balancing to resolve search and seizure issues. *See* Thomas K. Clancy, *The Fourth Amendment: Its History and Interpretation* 470–531 (2008) [hereinafter Clancy]. In any given case, it is impossible to predict which model will apply.

As a result, even if uniformity were the goal, a policy of blind adoptionism may cause more harm than it is worth. As noted recently by the Tennessee Supreme Court, "[state] constitutional standards are not destined to walk in lock step with the uncertain and fluctuating federal standards and do not relegate [state] citizens to the lowest levels of constitutional protection, those guaranteed by the national constitution." *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 14–15 (Tenn. 2000) (citation and internal quotation marks omitted).

Another pragmatic ground offered in support of uniformity is that law enforcement will be too confused by independent state constitutional law. This argument is flawed. As has been repeatedly pointed out, there are not two standards for state law enforcement officials when a state supreme court develops its independent state law in criminal procedure. Law enforcement officials need not learn two different standards; they need only learn one, namely, whatever standard is most restrictive. *See* 1 Friesen § 1.03[4][b], at 1–15 to 1–16; Tarr at 181 n.32. Given the professionalism and training of Iowa law enforcement, we should not sell their abilities so short. Iowa law enforcement is not inferior in ability to its counterparts in New York, New Jersey, Wisconsin, Oregon, Georgia, Minnesota, Indiana, and the many other states that have embraced robust independent state constitutional law.

Finally, uniformity converts a state supreme court into a legal chameleon that changes color with the latest changes in the

jurisprudence of the United States Supreme Court. Do we retire the writings of Justices Brandeis, Holmes, Cardozo, Stone, and Jackson because their views are no longer cited by current majorities of the United States Supreme Court? And what about the Iowa legal tradition and culture as reflected in *In re Ralph* and its progeny? As former Chief Justice of Indiana Randall Shepard noted:

> [W]hat respectable alternative is there to independent state constitutional jurisprudence? Is it a nation where civil liberties at all levels of activity depend solely on whether the left, the center, or the right of the U.S. Supreme Court is ascendant at the moment? Is it a country where state courts hearing ninety percent of the litigation resolve the most important cases without regard to their own history or precedent? Surely not.

Randall T. Shepard, *The Maturing Nature of State Constitution Jurisprudence,* 30 Val. U. L. Rev. 421, 456 (1996). Under the uniformity theory, the Iowa Supreme Court would morph into a Twelfth United States Circuit Court of Appeals.

4. *Deference to United States Supreme Court Justices.* The deference notion is contrary to a number of threads of constitutional development. The abandonment of *Swift v. Tyson,* 41 U.S. (16 Pet.) 1, 10 L. Ed. 865 (1842), for the rule in *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), tended to remove federal judges from interpretation of state law. Further, as indicated in *Stone v. Powell,* 428 U.S. 465, 493 n.35, 96 S. Ct. 3037, 3052 n.35, 49 L. Ed. 2d 1067, 1087 n.35 (1976), and its progeny, the United States Supreme Court has confidence in the ability of the state courts to handle federal constitutional claims. The discovery that state courts are now disabled from independently considering state constitutional claims because of their alleged lack of quality cuts against these important trends in federal law.

In any event, the notion that members of the United States Supreme Court have some kind of superior wisdom that we must show deference to when interpreting provisions of the Iowa Constitution is doubtful at best. History shows otherwise. Most of us would prefer the decisions of Iowa judges in *In re Ralph* to the work of the United States Supreme Court in *Dred Scott* and the generous Iowa approaches in *Clark* and *Coger* to the narrow approach in *Plessy.* Cases like *Korematsu v. United States*, 323 U.S. 214, 65 S. Ct. 193, 89 L. Ed. 194 (1944), and *Dennis v. United States*, 341 U.S. 494, 71 S. Ct. 857, 95 L. Ed. 1137 (1951), do not inspire our confidence. *See* Louis Henkin, *Revolutions and Constitutions*, 49 La. L. Rev. 1023, 1042–43 & n.28 (1989). Indeed, it has been suggested that through most of our history, federal courts have come up short in the protection of basic American rights. Solimine & Walker at 28.

Further, extraordinary state court judges with outstanding reputations have helped to develop what is now a substantial body of independent state constitutional law. Among others, distinguished state judges such as Shirley Abrahamson of Wisconsin, Christine Durham of Utah, Thomas Hayes of Vermont, Judith Kaye of New York, Hans Linde of Oregon, Stanley Mosk of California, Ellen Peters of Connecticut, Stewart Pollock of New Jersey, Randall Shepard of Indiana, Marsha Ternus of Iowa, and Robert Utter of Washington have enriched the legal culture in their states and across the nation.[23] There is no basis to

---

[23]Many of these state court judges have published thoughtful scholarly articles on independent state constitutional law. *See, e.g.*, Shirley S. Abrahamson, *Divided We Stand: State Constitutions in a More Perfect Union*, 18 Hastings Const. L.Q. 723 (1991); Shirley S. Abrahamson, *Criminal Law and State Constitutions: The Emergence of State Constitutional Law*, 63 Tex. L. Rev. 1141 (1985); Shirley S. Abrahamson, *Reincarnation of State Courts*, 36 Sw. L.J. 951 (1982); Judith S. Kaye, *Contributions of State Constitutional Law to the Third Century of American Federalism*, 13 Vt. L. Rev. 49 (1988);

discount the work of these outstanding state supreme court justices. Is there any reason to believe that Justices Holmes, Cardozo, O'Connor, and Souter were less intelligent or less capable when they served on state supreme courts? As noted by two observers, "Considering the judicial systems as a whole, we believe it is demeaning and inaccurate to assert a lack of talent in the state and local judicial arena." Solimine & Walker at 132.

In fact, there is reason to believe that in some respects, state supreme court justices may be better positioned than United States Supreme Court Justices to decide questions of state constitutional law. As noted above, state judges are not affected by federalism concerns and will not face pressures to underenforce constitutional norms. Further, as Justice Abrahamson pointed out, criminal law is an area of traditional expertise for state court judges. Abrahamson, 63 Tex. L. Rev. at 1148–49. Justice Ginsberg made a similar point in *Robinette*, noting that state courts have a "unique vantage point" in assessing the constitutional dimensions of traffic stops. 519 U.S. at 40, 117 S. Ct. at 422, 136 L. Ed. 2d at 355.

_____

Judith S. Kaye, *Dual Constitutionalism in Practice and Principle*, 61 St. John's L. Rev. 399 (1987); Hans A. Linde, *E Pluribus—Constitutional Theory and State Courts*, 18 Ga. L. Rev. 165 (1984); Hans A. Linde, *First Things First: Rediscovering the States' Bills of Rights*, 9 U. Balt. L. Rev. 379 (1980); Stanley Mosk, *State Constitutionalism: Both Liberal and Conservative*, 63 Tex. L. Rev. 1081 (1985); Stewart G. Pollock, *Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts*, 63 Tex. L. Rev. 977 (1985); Stewart G. Pollock, *State Constitutions as Separate Sources of Fundamental Rights*, 35 Rutgers L. Rev. 707 (1983); Randall T. Shepard, *The Maturing Nature of State Constitution Jurisprudence*, 30 Val. U. L. Rev. 421 (1996); Marsha Ternus, *Remarks: Symposium, Great Women, Great Chiefs*, 74 Alb. L. Rev. 1569 (2011); Robert F. Utter, *The Practice of Principled Decision-making in State Constitutionalism: Washington's Experience*, 65 Temp. L. Rev. 1153 (1992); Robert F. Utter, *Swimming in the Jaws of the Crocodile: State Court Comment on Federal Constitutional Issues When Disposing of Cases on State Constitutional Grounds*, 63 Tex. L. Rev. 1025 (1985).

In any event, what is required in constitutional adjudication is not brilliance, but judgment. As Justice Holmes said long ago when serving on the Supreme Judicial Court of Massachusetts, "[I]t is vain to suppose that solutions can be attained merely by logic and general propositions of law which nobody disputes." *Vegelahn v. Guntner,* 44 N.E. 1077, 1080, (Mass. 1896) (Holmes, J., dissenting). Phrased somewhat differently, "The life of the law has not been logic, it has been experience." Oliver Wendell Holmes, *The Common Law* 1 (1881).

Notwithstanding the above, no one could claim that state court judges in Iowa or in other states are perfect. Justice Linde observed that "most state courts had a poor record of taking seriously the individual rights and fair procedures promised in their states' bills of rights." Hans A. Linde, *E Pluribus—Constitutional Theory and State Courts*, 18 Ga. L. Rev. 165, 174 (1984). To the extent there are shortcomings, however, the solution, as Professor Paul Bator pointed out over thirty years ago, is to "create conditions to assure optimal performance by the state courts." Paul M. Bator, *The State Courts and Federal Constitutional Litigation*, 22 Wm. & Mary L. Rev. 605, 624 (1981).

5. *Efficiency.* Although it is rarely publically advanced as a reason for not engaging in independent state constitutional analysis, simply adopting the results of federal cases might be defended as more efficient for courts and judges. Developing a meaningful independent state constitutional analysis is hard work. Ken Gormley, *Significant Developments in State Constitutional Law, 1988*, 2 Emerging Issues St. Const. L. 1, 2 (1989). It would be easier to simply match our constitutional cases against federal precedents, briefly state our conclusion, and call it a day.

The problem with this approach, however, is that it ignores our obligation to construe our independent state constitution. Efficiency was not a goal of the framers of either the United States or Iowa Constitutions, and it should not be ours, either. If efficiency were the constitutional goal, there would be no bicameral legislature, no separation of powers, federalism would be replaced by a unified national state, and there would, of course, be no state courts. Instead, we must do the job assigned to us in our constitutional system as justices of the Supreme Court of Iowa, challenging as it may be,[24] and decide each and every independent constitutional claim we confront based on Iowa law and the peculiar facts.

6. *Summary.* State supreme court justices have a constitutional responsibility to do the very best job we can, in each and every case, and to decide state constitutional issues based on law, facts, and the best constitutional wisdom we can collectively muster. Arguments marshaled against independent state constitutional grounds such as claims that parallel language demands uniform outcomes ignores the open-textured qualities of most constitutional provisions. Claims that cases under State and Federal Constitutions should come to uniform results runs

_____

[24]Of course, the ability to engage in thoughtful, independent analysis of state constitutional issues is threatened when the docket of a state supreme court is unmanageable. As Robert Williams has pointed out, the creation of intermediate courts of appeal in many states has alleviated the workload on state supreme courts and allows for more considered development of the state's constitutional law. *See* Robert F. Williams, *Introduction: Celebrating Judge Michael Patrick King's Career*, 35 Rutgers L.J. xi, xi–xii (2004). It is undeniable, however, that most state supreme courts do not have the same resources available to it as the United States Supreme Court. The United States Supreme Court decides approximately seventy cases in a nine-month term, with each justice receiving the assistance of four law clerks. In Iowa, we have a somewhat larger caseload and only one law clerk per justice. Nonetheless, with the creation of the Iowa Court of Appeals and the advent of computerized research, our practical ability to meet our Iowa constitutional responsibilities and develop state constitutional law is much enhanced over prior decades.

directly counter to the Tenth Amendment and Madisonian concepts of the states providing a "double security" for liberty. In interpreting state constitutional law, state supreme court justices are not pins standing at attention ready to explode when the next divided opinion of the United States Supreme Court rolls down the constitutional alley. Instead, state supreme court justices have a solemn duty to independently determine the meaning and scope of our state constitutional provisions.

**D. Challenges to Independent State Constitutional Law in the Context of Search and Seizure.** From the beginning, the efforts of the United States Supreme Court to interpret the open-textured provisions of the Fourth Amendment have been fraught with difficulty. The relationship between the two Fourth Amendment clauses, the warrant clause and the reasonableness clause, is not clear. Further, the term "reasonable" is subject, then as now, to many different meanings. *See* Clancy at 11; Silas J. Wasserstrom, *The Fourth Amendment's Two Clauses*, 26 Am. Crim. L. Rev. 1389, 1389–99 (1989).

Interpretation of the Fourth Amendment has been further complicated by technological change. Trespass doctrine developed by the United States Supreme Court in *Olmstead v. United States*, 277 U.S. 438, 48 S. Ct. 564, 72 L. Ed. 944 (1928), was challenged by the advent of the telephone and was ultimately largely supplanted by an expectation-of-privacy approach. *See Katz*, 389 U.S. at 353, 88 S. Ct. at 512, 19 L. Ed. 2d at 583; *id.* at 360, 88 S. Ct. at 516, 19 L. Ed. 2d at 587 (Harlan, J., concurring). Now the expectation of privacy approach is being challenged by the Internet and cell phone technology and may be in the process of being replaced by concepts of autonomy. *See United States v. Jones*, 565 U.S. ___, ___, 132 S. Ct. 945, 949, 952, 181 L. Ed. 2d 911, 918 (2012).

In addition to the difficulties posed by the language and structure of the Fourth Amendment and technology change, there has been a striking lack of stable consensus on the proper application of Fourth Amendment law among the Justices. The Court's jurisprudence in the search and seizure area has been characterized by distinguished commentators as "not merely complex and contradictory, but often perverse";[25] as "a mass of contradictions and obscurities";[26] as involving cases decided within weeks of each other that are "irreconcilable";[27] as involving an expectation of privacy test that "remains remarkably opaque";[28] as being "in a state of theoretical chaos";[29] as maintaining "doctrinal incoherence of Fourth Amendment law" that "disturbs many judges and scholars";[30] as including "inconsistent and bizarre results";[31] as being "distressingly unmanageable";[32] as being "illogical and

---

[25]Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 758 (1994).

[26]Craig M. Bradley, *Two Models of the Fourth Amendment*, 83 Mich. L. Rev. 1468, 1468 (1985).

[27]Thomas K. Clancy, *The Fourth Amendment's Concept of Reasonableness*, 2004 Utah L. Rev. 977, 978 (2004).

[28]Oren S. Kerr, *Four Models of Fourth Amendment Protection*, 60 Stan. L. Rev. 503, 504–05 (2007).

[29]Donald R.C. Pongrace, *Stereotypification of the Fourth Amendment's Public/Private Distinction: An Opportunity for Clarity*, 34 Am. U. L. Rev. 1191, 1208 (1985).

[30]David E. Steinberg, *The Uses and Misuses of Fourth Amendment History*, 10 U. Pa. J. Const. L. 581, 581 (2008).

[31]Silas J. Wasserstrom & Louis Michael Seidman, *The Fourth Amendment as Constitutional Theory*, 77 Geo. L.J. 19, 29 (1988).

[32]Richard G. Wilkins, *Defining the "Reasonable Expectation of Privacy": An Emerging Tripartite Analysis*, 40 Vand. L. Rev. 1077, 1107 (1987).

unwieldy";[33] and as involving, with each case, "more duct tape on the Amendment's frame and a step closer to the junkyard."[34]

The problems in its Fourth Amendment cases have been recognized by the Justices of the United States Supreme Court for several decades. *See Gant,* 556 U.S. at 349, 129 S. Ct. at 1723, 173 L. Ed. 2d at 500 (noting the "checkered history of search-incident-to-arrest exception); *Acevedo,* 500 U.S. at 583, 111 S. Ct. at 1993, 114 L. Ed. 2d at 636 (Scalia, J., concurring) (referring to Fourth Amendment jurisprudence as "an inconsistent jurisprudence that has been with us for years"); *Skinner v. Ry. Labor Execs.' Ass'n,* 489 U.S. 602, 637, 109 S. Ct. 1402, 1424, 103 L. Ed. 2d 639, 673 (1989) (Marshall, J., dissenting) (asserting that concept of reasonableness is "virtually devoid of meaning, subject to whatever content shifting judicial majorities, concerned about the problems of the day, choose to give that supple term"); *Coolidge v. New Hampshire,* 403 U.S. 443, 490–91, 91 S. Ct. 2022, 2050, 29 L. Ed. 2d 564, 597 (1971) (Harlan, J., concurring) (calling for overhaul of Fourth Amendment law); *Ker,* 374 U.S. at 45, 83 S. Ct. at 1646, 10 L. Ed. 2d at 745 (Harlan, J., concurring) (noting that Court's search and seizure decisions are "hardly notable for their predictability"); *Chapman v. United States,* 365 U.S. 610, 618, 81 S. Ct. 776, 780, 5 L. Ed. 2d 828, 834 (1961) (Frankfurter, J., concurring) ("The course of the true law pertaining to searches and seizures . . . has not—to put it mildly—run smooth.").

---

[33]Jennifer Friesen, *State Courts as Sources of Constitutional Law: How to Become Independently Wealthy,* 72 Notre Dame L. Rev. 1065, 1092 (1997).

[34]Erik G. Luna, *Sovereignty and Suspicion,* 48 Duke L.J. 787, 787–88 (1999).

The incoherence of the Supreme Court's Fourth Amendment doctrine was recently on full display in *Jones*, where the Court considered whether the government violated the Fourth Amendment by placing a Global Positioning System tracking device on a suspect's vehicle. Justice Scalia, relying on his brand of originalist interpretation of the Fourth Amendment, found that the government action amounted to a trespass and was thus an unlawful search. *Jones*, 565 U.S. at ___, 132 S. Ct. at 949, 181 L. Ed. 2d at 918. Justice Alito, joined by three other members, found Justice Scalia's opinion incredulous, concluding that "it is almost impossible to think of late–18th-century situations that are analogous to what took place in this case." *Id.* at ___, 132 S. Ct. at 958, 181 L. Ed. 2d at 928 (Alito, J., concurring). Nonetheless, he found the government's action unreasonable under the Fourth Amendment. *Id.* at ___, 132 S. Ct. at 964, 181 L. Ed. 2d at 934. Justice Sotomayor concurred with Justice Scalia's majority opinion, but stressed that the Fourth Amendment is not concerned only with trespassory intrusions on property but has broader application. *Id.* at ___, 132 S. Ct. at 955–56, 181 L. Ed. 2d at 924–25 (Sotomayor, J., concurring). She noted that with changing technology "it may be necessary to reconsider the premise than an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties." *Id.* at ___, 132 S. Ct. at 957, 181 L. Ed. 2d at 926. In light of the inherent challenges of search and seizure law, the historic difficulties faced by the United States Supreme Court, and the fractured opinions in cases like *Jones*, the notion that we should adopt the United States Supreme Court cases to introduce guidance or uniformity is simply untenable.

Perhaps in part because of the state of federal precedents, the field of search and seizure is one of the most vibrant areas of state

constitutional law.  The majority of states have some kind of independent state constitutional law in the area.  *See* Barry Latzer, *Toward Decentralization of Criminal Procedure:  State Constitutional Law and Selective Disincorporation*, 87 J. Crim. L. & Criminology 63, 92 (1996) (estimating forty-seven of the fifty states have some departures from federal precedent).

By way of illustration only, a number of state supreme courts, like Iowa, have rejected the "good faith" exception to the exclusionary rule.[35] Similarly, state supreme courts have rejected the approach of the United States Supreme Court with respect to the requirements of affidavits supporting search warrants,[36] the ability of law enforcement to search curbside garbage without a warrant,[37] whether business records in the hands of third parties may be produced without a warrant,[38] whether

---

[35]*See, e.g.*, *State v. Marsala*, 579 A.2d 58, 59 (Conn. 1990); *Mason v. State*, 534 A.2d 242, 254–55 (Del. 1987); *State v. Guzman*, 842 P.2d 660, 677 (Idaho 1992); *State v. Zanter*, 535 N.W.2d 624, 634 (Minn. 1995); *State v. Canelo*, 653 A.2d 1097, 1105 (N.H. 1995); *State v. Novembrino*, 519 A.2d 820, 857 (N.J. 1987); *State v. Gutierrez*, 863 P.2d 1052, 1066 (N.M. 1993); *People v. Bigelow*, 488 N.E.2d 451, 458 (N.Y. 1985); *State v. Carter*, 370 S.E.2d 553, 554 (N.C. 1988); *Commonwealth v. Edmunds*, 586 A.2d 887, 905–06 (Pa. 1991); *State v. Oakes*, 598 A.2d 119, 126–27 (Vt. 1991); *see also* 2 Friesen § 11.05[2], at 11–67 to 11–69 & nn.297–315.

[36]*See, e.g.*, *State v. Jones*, 706 P.2d 317, 322 (Alaska 1985); *State v. Detroy*, 72 P.3d 485, 490, 493–94 (Haw. 2003); *Commonwealth v. Upton*, 476 N.E.2d 548, 556–57 (Mass. 1985); *State v. Cordova*, 784 P.2d 30, 36 (N.M. 1989); *People v. Johnson*, 488 N.E.2d 439, 441, 445 (N.Y. 1985); *State v. Worsham*, 834 P.2d 1033, 1036 (Or. Ct. App. 1992); *State v. Jacumin*, 778 S.W.2d 430, 436 (Tenn. 1989); *State v. Jackson*, 688 P.2d 136, 141 (Wash. 1984); *see also* 2 Friesen § 11.05[1][a], at 11–60 to 11–61 & nn.263–65, 268–71.

[37]*See, e.g.*, *State v. Tanaka*, 701 P.2d 1274, 1276 (Haw. 1985); *State v. Goss*, 834 A.2d 316, 318–19 (N.H. 2003); *State v. Hempele*, 576 A.2d 793, 800–01, 810 (N.J. 1990); *State v. Galloway*, 109 P.3d 383, 389 (Or. Ct. App. 2005); *State v. Morris*, 680 A.2d 90, 93–94 (Vt. 1996); *see also* 2 Friesen § 11.04[3], at 11–38 to 11–39 & nn.164–65.

[38]*See, e.g.*, *Charnes v. DiGiacomo*, 612 P.2d 1117, 1120–21 (Colo. 1980); *People v. Jackson*, 452 N.E.2d 85, 89 (Ill. Ct. App. 1983); *State v. McAllister*, 875 A.2d 866, 875 (N.J. 2005); *Commonwealth v. DeJohn*, 403 A.2d 1283, 1289–90 (Pa. 1979); *State v.*

random road blocks as part of an effort to alleviate drunk driving run afoul of search and seizure principles,[39] whether a seizure requires a show of authority or whether a reasonable belief that one is not free to leave is sufficient,[40] whether a valid consent search requires a knowing and voluntary waiver,[41] the scope of permissible searches pursuant to a traffic stop,[42] the extent and scope of the curtilage,[43] and the validity and scope of reasonable expectations of privacy as an interpretive tool.[44]

---

*Thompson*, 810 P.2d 415, 418 (Utah 1991); *see also* 2 Friesen at 11.04[5], at 11–41 to 42 & nn.176–79.

[39] *See, e.g.*, *Sitz v. Dep't of State Police*, 506 N.W.2d 209, 223–25 (Mich. 1993); *Ascher v. Comm'r of Pub. Safety*, 519 N.W.2d 183, 187 (Minn. 1994); *see also State v. Henderson*, 756 P.2d 1057, 1063 (Idaho 1988) (invalidating sobriety checkpoint where police lack express legislative authority, particularized suspicion, and judicial approval on state constitutional grounds prior to United States Supreme Court's decision to uphold them on a general reasonableness standard in *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990)); *State v. Boyanovsky,* 743 P.2d 711, 712 (Or. 1987) (invalidating warrantless sobriety roadblock under state constitution prior to United States Supreme Court's decision in *Sitz*); *Pimental v. Dep't of Transp.*, 561 A.2d 1348, 1352 (R.I. 1989) (same); *City of Seattle v. Mesiani,* 755 P.2d 775, 777 (Wash. 1988) (same); 2 Friesen § 11.09, at 11–110 to 11–112 & n.479.

[40] *See, e.g.*, *People v. Hill*, 929 P.2d 735, 738–39 (Colo. 1996); *State v. Greenfield*, 634 A.2d 879, 883 (Conn. 1993); *Jones v. State*, 745 A.2d 856, 869 (Del. 1999); *State v. Quino*, 840 P.2d 358, 362 (Haw. 1992); *Commonwealth v. Stoute*, 665 N.E.2d 93, 95–98 (Mass. 1996); *In re Welfare of E.D.J.*, 502 N.W.2d 779, 783 (Minn. 1993); *State v. Clayton*, 45 P.3d 30, 34 (Mont. 2002); *State v. Quezada*, 681 A.2d 79, 80–81 (N.H. 1996); *State v. Tucker*, 642 A.2d 401, 405–06 (N.J. 1994); *Commonwealth v. Matos*, 672 A.2d 769, 776 (Pa. 1996); *State v. Randolph*, 74 S.W.3d 330, 336–37 (Tenn. 2002); *State v. Young*, 957 P.2d 681, 687–89 (Wash. 1998); *State v. Jones*, 456 S.E.2d 459, 467 & n.17 (W. Va. 1995); *see also* 2 Friesen § 11.010[1], at 11–116 to 11–118 & n.499.

[41] *See, e.g.*, *State v. Trainor*, 925 P.2d 818, 828 (Haw. 1996); *Penick v. State*, 440 So. 2d 547, 551 (Miss. 1983); *State v. Carty*, 790 A.2d 903, 907 (N.J. 2002); *Commonwealth v. Cleckley*, 738 A.2d 427, 433 (Pa. 1999); *see also* 2 Friesen § 11.012, at 11–147 to 11–148 n.618.

[42] *See, e.g.*, *People v. Moorman*, 859 N.E.2d 1105, 1116 (Ill. App. Ct. 2006); *State v. Brown*, 792 N.E.2d 175, 179 (Ohio 2003); *State v. Harris*, 916 So. 2d 284, 289 (La. Ct. App. 2005); *Commonwealth v. Gonsalves*, 711 N.E.2d 108, 112 (Mass. 1999); *State v. Askerooth*, 681 N.W.2d 353, 363 (Minn. 2004); *State v. Bauer*, 36 P.3d 892, 895 (Mont. 2001); *State v. Bayard*, 71 P.3d 498, 502 (Nev. 2003) (per curiam); *State v. Bricker*, 134 P.3d 800, 806–08 (N.M. Ct. App. 2006); *see also* 2 Friesen § 11.07, at 11–83 to 11–84 & nn.372, 375–76; *id.* § 11.010[3], at 11–140 to 11–141 & n.588.

A number of courts and scholars have emphasized that search and seizure law is especially amenable to independent state constitutional analysis. This is particularly true as the United States Supreme Court utilizes so called "balancing tests" which involve only contemporary weighing of competing pragmatic considerations about which reasonable persons may differ. *See generally* T. Alexander Aleinikoff, *Constitutional Law in the Age of Balancing*, 96 Yale L.J. 943 (1987). Such contemporary balancing involves "legislative or social facts" about which reasonable persons may differ. *See* Williams at 172–73; *see also* Neil Coleman McCabe, *Legislative Facts as Evidence in State Constitutional Search Analysis*, 65 Temp. L. Rev. 1229, 1242–51 (1992).

As the above material demonstrates, there are good reasons to develop an independent body of state constitutional law in the search and seizure arena. We have plenty of judicial company in this undertaking.

**E. Summary.** The First American Constitutions were state constitutions. Many of the initial state constitutions had search and seizure provisions, which served as a model for Madison as he drafted the Fourth Amendment. Nothing in the adoption of the United States Constitution or the Bill of Rights changed the status of state constitutions as an independent source of law. Indeed, the independent

---

[43] *See, e.g., State v. Webb*, 943 P.2d 52, 57 (Idaho 1997); *State v. Bullock*, 901 P.2d 61, 75–76 (Mont. 1995); *People v. Scott*, 593 N.E.2d 1328, 1337 (N.Y. 1992); *State v. Dixson*, 766 P.2d 1015, 1024 (Or. 1988); *State v. Kirchoff*, 587 A.2d 988, 995–96 (Vt. 1991); *see also* 2 Friesen § 11.04[1], at 11–34 to 11–37 nn.147–48, 150–51, 154–55.

[44] *See, e.g., State v. Wallace*, 910 P.2d 695, 705–07 (Haw. 1996); *Moran v. State*, 644 N.E.2d 536, 540 (Ind. 1994); *State v. Campbell*, 759 P.2d 1040, 1048–49 (Or. 1988); *see also* 2 Friesen § 11.03[2], at 11–11 to 11–12 nn.39, 41, 43.

nature of state constitutional provisions was reinforced by adoption of the Tenth Amendment.

For most of our constitutional history, the provisions of the Bill of Rights of the United States Constitution did not apply against the states. In the middle of the twentieth century, the United States Supreme Court began to incorporate provisions of the Federal Bill of Rights, including the Fourth Amendment, to provide a floor of protection against state transgressions. Incorporation came with two important consequences. One consequence of incorporation was a tendency to dilute the substantive protections in order to avoid a nationwide rule that did not take into account local conditions and experience. Another consequence was that the focus of the legal community shifted toward federal constitutional protections and away from protections in independent state constitutions. As the Supreme Court proceeded to steadily reduce the scope of constitutional protections, however, state courts began to reinvigorate their independent state constitutional analysis.

Independent state constitutional law is now a well-established part of our state's legal fabric. The independent state constitutional approach utilized by the majority in this case under article I, section 8 is logical, comports with the history of both the United States and Iowa Constitutions, and is solidly supported in our caselaw and the well-reasoned caselaw of other jurisdictions.

## III. Resolution of the Constitutional Issues in This Case.

The majority opinion in this case decides, under the particular facts and circumstances, that Baldon's consent cannot be considered voluntary under article I, section 8 of the Iowa Constitution. We conclude that when an individual is faced with the so-called "choice" of consenting to wide-open suspicionless searches or remaining in prison

for an extended period of time, the "choice" is not a truly voluntary one. We thus reject a rigidly formalistic consent doctrine in which the mere fact that a person is presented with a Hobson's choice is sufficient to make consent voluntary. We base our opinion on the common sense observation that where the state makes the stakes of nonconsent so high that no reasonable person would choose otherwise, there is no realistic choice at all. We continue what we started in *Pals*, namely, insisting that consent doctrine under article I, section 8 must realistically assess the ability of the individual to say "No."

For the reasons well expressed in the majority opinion, the outcome in this case is the only reasonable one. It would be a plain fiction to maintain that consent to unlimited search authority was voluntary when the consequence of refusal is continued long-term incarceration.

It is possible that such consent would not be found voluntary by the United States Supreme Court under the Fourth Amendment. *Cf. United States v. Giannetta*, 909 F.2d 571, 576 n.4 (1st Cir. 1990) (stating "a question of coercion would arise as to any contention that 'agreement' to a probation search condition constitutes a general consent to search"). The United States Supreme Court, however, has often applied the "totality of circumstances" test of *Schneckloth* in a very unrealistic way. In *Florida v. Bostwick*, 501 U.S. 429, 438–40, 111 S. Ct. 2382, 2388–89, 115 L. Ed. 2d 389, 400–02 (1991), the Court determined that consent to search by passengers on a bus was voluntary even though armed officers prevented passengers from leaving the confined space of the vehicle. Similarly, in *INS v. Delgado*, 466 U.S. 210, 218, 104 S. Ct. 1758, 1763–64, 80 L. Ed. 2d 247, 256 (1984), the Court determined consent to search was voluntary even though armed guards blocked the exits to a

workplace. By choosing to base our opinion in this area on the Iowa Constitution, we obtain finality, avoid the necessity of attempting to follow contradictory and doubtful federal authorities, and develop our body of independent law.

### IV. Conclusion.

For the reasons expressed above, I join in the majority opinion and concur in the judgment in this case.

**MANSFIELD, Justice (dissenting).**

I respectfully dissent. I believe the Iowa Constitution, like the United States Constitution, permits the government to require a prisoner as a condition of parole to agree to searches during his or her term of parole. Such searches should especially be upheld when, as here, they are under the control and with the authorization of the parole officer, and when reasonable suspicion exists that the parolee has committed a crime or violated his terms of parole. While I acknowledge that much of my disagreement relates to this court's 2010 decision in *State v. Ochoa*, 792 N.W.2d 260 (Iowa 2010), I believe the present decision is legally flawed, even accepting *Ochoa*.

## I. Facts.

The thirty-one-year-old defendant, Isaac Baldon, who had a substantial criminal history including first-degree theft, third-degree burglary, possession with intent to deliver a controlled substance, transportation of a firearm as a felon, and being a felon in possession of a firearm, was paroled on the latter three charges on November 3, 2008. In his parole agreement, he specifically agreed to several conditions, including:

> I shall reside at the place designated in the attached Parole Release instructions and shall not change residence unless I receive approval from my supervising officer.

> I will submit my person, property, place of residence, vehicle, personal effects to search at any time, with or without a search warrant, warrant of arrest or reasonable cause by any parole officer or law enforcement officer.

> I shall abstain from the use, purchase, possession, or transfer of any drug unless prescribed for me by a physician, and shall submit to drug monitoring tests when directed by my supervising officer. I shall not associate with drug users or sellers while on parole and shall avoid places where drugs are sold.

Six months later, Bettendorf police were patrolling the Traveler Motel, "probably the single highest crime location that we have in our city. We check it every day several times a day and run across all manner of criminal activity at that location," including drugs, prostitution, and weapons offenses. Typically, the police check the license plates of all cars parked at the motel.

Officer Tripp ran a license plate check and determined that a vehicle registered to Baldon was parked at the motel. He also determined that Baldon had prior driver's license revocations and was on parole. Officer Tripp called in to headquarters and asked that Baldon's parole officer be notified. When contacted, Baldon's parole officer, Officer Peterson, gave permission for Baldon's hotel room and vehicle to be searched. Officer Peterson also said he would be coming to the motel.

Officer Tripp went to the front desk of the motel and learned that Baldon was registered to a room at the motel. This was different from the authorized Davenport residence he had provided to his parole officer. After Officer Peterson arrived, Officer Tripp, Officer Peterson, and two other police officers went to Baldon's room and knocked on the door. Receiving no answer, they knocked again a minute or so later. At this point, Officer Tripp announced they were police and that Baldon needed to open the door.

When Baldon opened the door in his underwear, Officer Peterson recognized him and said hello. A sixteen-year-old girl wearing only a T-shirt was sitting on the bed.[45] Her underwear was on the floor. One of

---

[45]Minors are not allowed at the Traveler Motel. The girl was cited for being a minor in possession of tobacco and released to a guardian.

the officers took her outside. Officer Tripp, Officer Peterson, and the fourth officer conducted a search of the room and found nothing illegal.

Officer Tripp asked Baldon for the keys to his car. Officer Tripp went outside, began searching the vehicle, and found a baggie of marijuana in the trunk area. He then went back to the motel room, informed Officer Peterson what he had found, and the two of them went back out to the vehicle and ultimately found five other smaller baggies of marijuana. After being Mirandized, Baldon admitted that he knew the marijuana was in the vehicle, he had received it as payment for a debt, and he anticipated that by breaking it up and selling it he would receive $800. Baldon was criminally charged, his motion to suppress was denied, and he was convicted of possession of marijuana with intent to deliver and failure to have a drug stamp. *See* Iowa Code § 124.401(1)(*d*); *id.* § 453B.3 (2009).

## II.  Parole Searches and Our *Ochoa* Decision.

In a 6–3 decision, the United States Supreme Court held in 2006 that a parolee could be searched by a police officer without a warrant or particularized suspicion based on a California law that requires every prisoner eligible for release on parole to " 'agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause.' " *Samson v. California*, 547 U.S. 843, 846, 126 S. Ct. 2193, 2196, 165 L. Ed. 2d 250, 255 (2006) (quoting Cal. Penal Code § 3067(a) (West 2000)). The Court noted that parole "is an established variation on imprisonment of convicted criminals," and that the state is usually "willing to extend parole only because it is able to condition it upon compliance with certain requirements." *Id.* at 850, 126 S. Ct. at 2198, 165 L. Ed. 2d at 258 (citation and internal quotation marks omitted).

Parolees "have severely diminished expectations of privacy by virtue of their status alone." *Id.* at 852, 126 S. Ct. at 2199, 165 L. Ed. 2d at 259. The Court also observed that the state has an "overwhelming interest" in supervising parolees because they are more likely to commit future criminal offenses. *Id.* at 853, 126 S. Ct. at 2200, 165 L. Ed. 2d at 260 (citation and internal quotation marks omitted).

In *Ochoa,* a parole search case, we departed from *Samson* and decided that the search and seizure clause of Iowa's Constitution provides more protection to parolees than the virtually identical Search and Seizure Clause of the United States Constitution. *See* 792 N.W.2d at 287–90. We thus held that the Iowa Constitution prohibited warrantless, suspicionless searches of parolees. We did not claim that this outcome was required by anything particular in the Iowa Constitution or any specific precedent under that constitution. Rather, the heart of the decision was a philosophical disagreement with the *Samson* holding, and we explained that we found the three-justice dissent more compelling than the six-justice majority. *Id.* at 282–83, 286–91.

I have serious concerns about an approach that treats a United States Supreme Court decision as just another dish on the menu. *See id.* at 267 ("The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision."). The decisions of that Court are rendered by nine legal scholars of exceptional distinction. They come only after each case has been the subject of extensive adversarial briefing, argument, and attention. By contrast, this court composed its thirty-page state constitutional opinion in *Ochoa* without the benefit of *any* argument other than federal constitutional argument. *See State v. Ochoa,* No. 08–0412, 2009 WL 398390, at *2 n.1 (Iowa Ct.

App. 2009) (noting that *Ochoa* "has not asserted that the state constitutional provision should be interpreted differently than the Fourth Amendment"). Simply stated, if we believe in an adversary system, the adversarial process before the United States Supreme Court is far more robust. That is especially true when, as in *Ochoa*, we venture into state constitutional issues that no one has briefed.[46]

I believe we went too far in *Ochoa*. We abandoned longstanding precedent without admitting we were doing so. We read too much into the text and history of the Iowa Constitution. And, even assuming it was appropriate to treat *Samson* as just another option, our simplistic "home trumps parolee status" approach was too dismissive of the grounds on which *Samson* was decided.

The first error committed by the court in *Ochoa* was to discard a long line of Iowa Supreme Court cases, many of them rather recent, giving deference to federal interpretations of the Fourth Amendment.

> Because the search and seizure clause of the Iowa Constitution is nearly verbatim to the language of the Fourth Amendment, cases interpreting the Fourth Amendment are persuasive—but not binding—on our interpretation of the Iowa Constitution. We usually interpret the scope and purpose of the Iowa Constitution's search and seizure provisions to track with federal interpretations of the Fourth Amendment.

*State v. Christopher*, 757 N.W.2d 247, 249 (Iowa 2008) (citation omitted). "The scope and purpose of Iowa's search and seizure clause is coextensive with the federal court's interpretation of the Fourth Amendment." *State v. Carter*, 733 N.W.2d 333, 337 (Iowa 2007). "The

---

[46]Here, as in *Ochoa*, the court's opinion is self-generated. It is not based on matters the appellant has briefed on appeal. Baldon's brief does not even address the consent issue. He maintains, rather, that we decided that question in *Ochoa* and that *Ochoa* controls this case. *See* Appellant's Br. at 10–11.

Iowa Supreme Court generally interprets article I, section 8 of the Iowa Constitution to track federal interpretations of the Fourth Amendment." *Atwood v. Vilsack*, 725 N.W.2d 641, 650 (Iowa 2006). "Cases interpreting the federal constitution are persuasive in our interpretation of the state constitution because the federal and state search-and-seizure clauses are similar." *State v. Hoskins*, 711 N.W.2d 720, 725 (Iowa 2006).

> Because the federal and state search-and-seizure clauses are nearly identical, federal cases interpreting the federal provision are persuasive in our interpretation of the state provision. However, such cases are not binding on this court regarding our interpretation of the state provision.

*State v. Carter*, 696 N.W.2d 31, 37 (Iowa 2005) (citation and internal quotation marks omitted).

> The Iowa Constitution also contains a search and seizure clause that is virtually identical to the Fourth Amendment. Accordingly, we usually interpret the scope and purpose of article I, section 8, of the Iowa Constitution to track with federal interpretations of the Fourth Amendment.

*State v. Jones*, 666 N.W.2d 142, 145 (Iowa 2003) (citations and internal quotation marks omitted).

Despite the length of the court's opinion, *Ochoa* did not mention any of these recent statements.[47] Instead, it made the following assertion: "This court has to date generally developed a body of independent state constitutional law in the search and seizure area slowly and cautiously." *Ochoa*, 792 N.W.2d at 265.

That is overstating things a bit. Actually, a careful reading of *Ochoa* would reveal exactly *one* cited case where we had diverged from

---

[47]*Ochoa* cites a few cases with similar language, but the last one is from 1988. *See Ochoa*, 792 N.W.2d at 266 (citing *State v. Showalter*, 427 N.W.2d 166, 168 (Iowa 1988)). *Ochoa* would thus have the reader believe that only "older cases" embraced such an approach. *Id.* That is simply not true.

federal interpretation of the Fourth Amendment in our interpretation of article I, section 8. *See State v. Cline*, 617 N.W.2d 277 (Iowa 2000), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). In *Cline*, this court declined to follow *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 1160, 94 L. Ed. 2d 364 (1987), which recognized a good faith exception to the application of the exclusionary rule. *See* 617 N.W.2d at 285–93.

Several points about *Cline* should be noted. First, the case was about remedy, not right. We did not say the Iowa Constitution would invalidate a search that the United States Constitution permits. In fact, we applied both federal and Iowa precedent in finding the underlying search unconstitutional, stating,

> Because the language of article I, section 8 of the Iowa Constitution is nearly identical to the Fourth Amendment, the two provisions are generally deemed to be identical in scope, import, and purpose. Therefore, although our discussion of probable cause will focus on the Fourth Amendment, our analysis of this issue is equally applicable to the defendant's claim under the Iowa Constitution.

*Id.* at 281–82 (citation and internal quotation marks omitted). *Cline* simply held that Iowa's courts, as a matter of *remedy*, would not allow the use of evidence that had been unconstitutionally obtained.

Second, even on the question of remedy, we continued to sound a note of deference. Thus, concerning the exclusionary rule, we said, "In accordance with these general principles, we strive to be consistent with federal constitutional law in our interpretation of the Iowa Constitution, but we jealously guard our right and duty to differ in appropriate cases." *Id.* at 285 (citation and internal quotation marks omitted).

Third, in deviating from federal precedent concerning the exclusionary rule, we followed an approach that, according to our

research, most states addressing the issue had taken under their own state constitutions. *See id.* at 293 n.3.

None of these observations applies to *Ochoa*. Contrary to *Cline* and a host of prior and (as noted) subsequent decisions, we abandoned in *Ochoa* all deference to federal interpretation of the Fourth Amendment. We claimed that we did so "to resolve any inconsistency in our prior cases." *Ochoa*, 792 N.W.2d at 267. That assertion was incorrect. There was *no* prior inconsistency on the question whether United States Supreme Court interpretations of the Fourth Amendment were entitled to deference in interpreting the nearly identical wording of article I, section 8. We simply decided to go in a different direction.[48]

Having set aside what went before, this court in *Ochoa* then embarked on a brief textual analysis of article I, section 8. We observed that in article I, section 8, the reasonableness clause and the warrant

---

[48]Seeking to patch this hole in *Ochoa*, the majority now cites *State v. Tonn*, 195 Iowa 94, 104–07, 191 N.W. 530, 535–36 (1923), a case where this court decided that the exclusionary rule does not apply in Iowa and thus found that article I, section 8 should provide *less* protection than the Fourth Amendment. *Tonn*, like *Cline*, was a case about remedy, not about the scope of the right. *Tonn* has not been the law since 1961, when the United States Supreme Court held that the Fourteenth Amendment requires the federal exclusionary rule apply to the states. *See Mapp v. Ohio*, 367 U.S. 643, 655–57, 81 S. Ct. 1684, 1691–92, 6 L. Ed. 2d 1081, 1090–91 (1961).

*Tonn* was not cited in *Ochoa*, perhaps because it did not fit the narrative of Iowa historically having given "considerable solicitude to the sanctity of the home." *See Ochoa*, 792 N.W.2d at 284. *But see Tonn*, 195 Iowa at 101–02, 191 N.W. at 532–33 (upholding a warrantless search where the county attorney simply went to the hotel where defendant was staying and, without his knowledge, retrieved his suitcase and handbag).

*Tonn* justified its deviation from the federal exclusionary rule partly on the ground that "the overwhelming weight of authority in the state courts" already had decided not to follow that rule. 195 Iowa at 106, 191 N.W. at 534.

I agree that *Tonn* is one other case where this court declined to follow Federal Fourth Amendment interpretation. But it is truly a stretch to link *Tonn* and *Ochoa*, as if two disconnected opinions nearly one hundred years apart represent a consistent and unbroken line of authority.

clause are separated by a semicolon, whereas in the Fourth Amendment they are separated by a comma. *Id.* at 268–69. Citing a famous monograph on style, the court indicated that "a semicolon is used to emphasize the relationship between the two clauses of the sentence." *Id.* Thus, the court suggested (although it fell short of saying) that in Iowa's Constitution, there might be a closer connection between the two clauses. This strikes me as taking the grammarian out of context. As compared to a *period,* a semicolon might suggest a greater connection, but compared to a *comma*? Indeed, the cited grammarian makes this very point. *See* William Strunk, Jr. & E.B. White, *The Elements of Style* 6 (4th ed. 2000) (stating that a semicolon "suggests the close relationship between the two statements in a way that the [version consisting of two sentences separated by a period] does not attempt, and better then the [version consisting of two clauses separated by a comma and a conjunction] because it is briefer and therefore more forcible"). There are, it is worth noting, several other nonsubstantive variations between the two documents. For instance, the Iowa Constitution reorders the words "searches and seizures" to read "seizures and searches" and replaces "Warrants" with "warrant." I would not extract a substantive meaning out of these cosmetic differences.

*Ochoa*'s textual discussion was then followed by a bibliographical historical discussion of the Fourth Amendment. *Ochoa,* 792 N.W.2d at 269–72. Yet the opinion itself concluded that the eighteenth century historical record was of limited usefulness in addressing parole systems that were not introduced until the late nineteenth century. *Id.* at 272.

Turning then to the Iowa historical record, the *Ochoa* opinion found that it "tends to shed light on the value the Iowa framers placed on article I, section 8." *Id.* at 274. I think the basis for drawing this

conclusion is exceedingly thin.  *Ochoa* quoted a statement from one of our framers of our present 1857 Constitution.  *Id.*  (quoting Mr. Ells).  The point he was making, however, had nothing to do with article I, section 8.  He was explaining, rather, why his committee was proposing *additional* enumerated rights that, unlike article I, section 8, had not been part of the previous constitution.  1 *The Debates of the Constitutional Convention of the State of Iowa* 100 (W. Blair Lord rep., 1857), *available at* http://www.statelibraryofiowa.org/services/collec-tions/law-library/iaconst.

In addition, *Ochoa* quoted a statement from a framer of the 1844 Constitution.  According to *Ochoa*, this framer "deemed the most important right was 'to secure to the poor man a little spot of ground where he could build him a cottage and have a home for himself and family, free from the fear of being turned out of doors.' " *See* 792 N.W.2d at 275 (quoting Mr. Lucas).  However, this statement also had nothing to do with search and seizure.  Rather, it related to a proposed homestead amendment, providing that "[e]very person residing in the State to have the right to hold 80 acres of land, with the improvements, or a house," which did not make it into the 1844 (or the 1857) Constitution.  *See Fragments of the Debates of the Iowa Constitutional Conventions of 1844 and 1846*, at 159 (Benjamin F. Shambaugh ed., 1900), *available at* http://www.statelibraryofiowa.org/services/collections/law-library/iaconst.

*Ochoa* added that "the drafters of the Iowa Constitution placed the Iowa Bill of Rights at the beginning of the constitution, for apparent emphasis." 792 N.W.2d at 274.  No citation is provided for the "apparent emphasis" claim.  I think it is difficult to draw any inference from the ordering of provisions within our constitution.  The 1844 and the 1846

constitutions also began with a bill of rights. Article I, section 5 of the 1857 Constitution (repealed in 1992) provided that someone who had engaged in dueling would be disqualified from holding public office. Does this mean our framers thought article I, section 5 was more important than article I, section 8?

*Ochoa* also discussed briefly other states' constitutional precedents on parole searches. 792 N.W.2d at 283–84. It indicated that courts were divided before *Samson* on the constitutionality of suspicionless parole searches and noted that since *Samson,* two state supreme courts had "declined to depart from *Samson* in interpreting their state constitutions." *Id.* at 284.

With the benefit of more than two years' additional experience, it so far appears that this court stands alone in its flat-out rejection of *Samson. See In re Miranda,* 289 P.3d 957, 961 (Colo. 2012) (citing *Samson* and stating that in Colorado, "parole officers may search parolees' persons, residences, or vehicles unannounced, without a warrant, and without reasonable suspicion"); *State v. Cruz,* 174 P.3d 876, 881 (Idaho Ct. App. 2007) (declining to hold that the Idaho Constitution provides more protection than *Samson* and noting that Idaho has provided greater protections "based on the uniqueness of our state, our Constitution, and our long-standing jurisprudence," but "[n]one of these factors support a divergence from the interpretation of the Fourth Amendment by the United States Supreme Court in this case"); *State v. Bartylla,* 755 N.W.2d 8, 18–19 (Minn. 2008) (applying *Samson* under the Minnesota Constitution and stating that "we do not believe that the *Samson* approach reflects a retrenchment on the Bill of Rights"); *State v. Turner,* 297 S.W.3d 155, 166 (Tenn. 2009) ("A parole condition requiring that the parolee submit to warrantless searches is

reasonable in light of the parolee's significantly diminished privacy interests; the goals sought to be attained by early release; and society's legitimate interest in protecting itself against recidivism. We therefore adopt the reasoning of *Samson* and hold that the Tennessee Constitution permits a parolee to be searched without any reasonable or individualized suspicion where the parolee has agreed to warrantless searches by law enforcement officers."). In fact, the only out-of-state reported opinion to have cited *Ochoa* is a single judge's dissent. *See State v. Johnson*, 813 N.W.2d 1, 18 (Minn. 2012) (Meyer, J., dissenting). This should give us pause.

In addition, *Ochoa* discussed *State v. Cullison*, 173 N.W.2d 533 (Iowa 1970). *See Ochoa*, 792 N.W.2d at 285–86. But *Ochoa* recognized that *Cullison* was a Fourth Amendment decision. As described by the *Ochoa* court, *Cullison* "held that a parolee is afforded the same rights as any other person under the Fourth Amendment." *Id.* at 286. That was a correct characterization. The case makes no reference at all to article I, section 8 of the Iowa Constitution. The issue was whether a parolee by virtue of his or her *status* loses Fourth Amendment protection. *Cullison* applied mostly federal and out-of-state authority to conclude that "an Iowa State parolee's Fourth Amendment rights, privileges and immunities, [should] be accorded the same recognition as any other person." 173 N.W.2d at 536–37. As a Fourth Amendment decision, *Cullison* has been superseded by more recent United States Supreme Court authority. We did not suggest in *Ochoa* that *Cullison* was in any way a controlling precedent.[49]

---

[49]*Cullison* cited article II, section 5 of our constitution for the proposition that a convicted felon on parole loses the right to vote or hold public office. 173 N.W.2d at

Thus, *Ochoa* really came down to a disagreement with *Samson*. And there was not that much to say. Taking issue with the *Samson* majority, *Ochoa* concluded, "[T]he fact that a parolee is released into the larger community is the overriding factor for purposes of search and seizure analysis." 792 N.W.2d at 291. In short, *Ochoa* squarely rejected the *Samson* view that parole is a "variation on imprisonment," *see Samson*, 547 U.S. at 850, 126 S. Ct. at 2198, 165 L. Ed at 258, and instead found dispositive the parolee's physical location outside of prison. Thus, the general authority that the state unquestionably has to conduct searches inside prison could not be applied, in the *Ochoa* court's view, once the prisoner had left prison on parole.[50]

I disagree with that underlying philosophical view. Consider this question: If the "sanctity of the home" trumps an offender's status, as we held in *Ochoa*, why has this court repeatedly upheld sex offender residency restrictions? *See, e.g., Formaro v. Polk County*, 773 N.W.2d 834 (Iowa 2009); *State v. Seering*, 701 N.W.2d 655 (Iowa 2005). These restrictions, which apply even after parole, severely limit where certain sex offenders can live. Most people would regard them as a more serious intrusion on "sanctuary, comfort, seclusion, security, and identity" than the search provision at issue in *Ochoa*. *See Ochoa*, 792 N.W.2d at 289. I recognize that we are talking about different constitutional provisions. But if we are going to engage in value-driven analysis, as we did in *Ochoa*, why has status won out in one area but not the other?

_____

537. However, its conclusion that he or she retains all other rights, including Fourth Amendment rights, was not based on anything in the Iowa Constitution. *Id.*

[50]We also cited "academic commentary" that was critical of *Samson*, the specific examples being one treatise and a "raft of student notes." *Ochoa*, 792 N.W.2d at 286–87.

As a result of *Ochoa* and its elimination of deference to federal interpretation of the Fourth Amendment, we now have two different sets of search and seizure rules in Iowa. If Ochoa or Baldon had been prosecuted for violating *federal* drug laws based on the incidents in question, notwithstanding the fact that the underlying search was conducted by state officials, the established Fourth Amendment law would have applied. *See United States v. Bach,* 310 F.3d 1063, 1066 (8th Cir. 2002) ("[F]ederal courts in a federal prosecution do not suppress evidence that is seized by state officers in violation of state law, so long as the search complied with the Fourth Amendment."). Thus, any motion to suppress would have been denied, and the denial would have been upheld on appeal. However, because they were prosecuted in state court, our rather unclear work-in-progress version of search and seizure jurisprudence under article I, section 8 applies.

The United States Supreme Court's interpretation of the Fourth Amendment has been comparatively stable. *See Davis v. United States,* ___ U.S. ___, ___, 131 S. Ct. 2419, 2433, 180 L. Ed. 2d 285, 301 (2011) ("Decisions overruling this Court's Fourth Amendment precedents are rare."). And there are decisions from many other appellate courts available to fill in gaps left by that Court. Unfortunately, Iowa officials can no longer rely on the very substantial body of law interpreting the Fourth Amendment and must instead engage in guesswork as to what this court will do next. I do not believe this disparity and uncertainty serve the public interest.

The concurrence offers two divergent reasons for not deferring to United States Supreme Court jurisprudence in this area. At one point, my colleague says that the Court's Fourth Amendment decisions display "a striking lack of stable consensus" and are marked by "incoherence."

Later, my colleague maintains that the Court has "proceeded to steadily reduce the scope of constitutional protections" and has "a tendency to dilute the substantive protections." One cannot have it both ways. Either the Court (in the view of the concurrence) is being inconsistent and unpredictable in its rulings, or it is on a consistent march to limit Fourth Amendment rights—unless one believes that ruling in favor of the government is itself a sign of incoherence. The concurrence states, "Law enforcement officials need not learn two different standards; they need only learn one, namely, whatever standard is most restrictive." But what is the Iowa standard? We have three cases—*Ochoa*, *State v. Pals*, 805 N.W.2d 767 (Iowa 2011), and now *Baldon*. I doubt even my colleagues would claim that this handful of decisions provide any meaningful guidance. They make it clear that what the United States Supreme Court has approved is not good enough, but without explaining what would be good enough.

The concurrence implies that more restrictions against "arbitrary exercise of government power" are on their way from this court. Therefore, according to the concurrence, "when in doubt, get a warrant." If this is the court's search and seizure jurisprudence, it is so generalized as to be meaningless. Obviously, there are some circumstances when all members of this court would vote to uphold a warrantless search.

The concurrence also makes the point that "a state in the federalist system amounts to a 'laboratory' of democracy." But when we substitute our judgment for that of Iowa's elected government on when a parolee may be searched, we are not being democratic. Rather, we are

overturning the decision of the people's representatives.[51]    It is noteworthy that a number of states have chosen to limit parole searches as a matter of law or regulation.  *See, e.g., State v. Coleman*, 257 P.3d 320, 327 (Kan. 2011) (noting that "[w]hile the *Samson* Court found that California parole conditions allowed the police to conduct suspicionless searches of parolees, the Kansas Legislature and the Parole Board elected to place restrictions on parolee searches"); *State v. Benavidez*, 231 P.3d 1132, 1137 (N.M. Ct. App. 2010) (requiring reasonable suspicion for a warrantless parolee search based on state regulation, not the state constitution); *State v. Rowan*, 814 N.W.2d 854, 861 (Wis. 2012) (rejecting a federal and state constitutional challenge to a parole condition authorizing suspicionless searches that was imposed based on a court's individualized determination  pursuant to Wisconsin law).

The issue is not whether we have the authority to independently interpret our own constitution.  Clearly we do.  Nor is the issue whether we are the final arbiters of the meaning of that constitution.  Clearly we are.  The issue is whether this substantial authority should be exercised in the search and seizure area with a degree of self-imposed modesty and

---

[51]The concurrence's invocation of Justice Brandeis's famous phrase is a bad fit. When Justice Brandeis used that phrase, he was dissenting from his colleagues' decision to strike down an Oklahoma law on constitutional grounds.  He wrote, "It is one of the happy incidents of the federal system that a single courageous State may, *if its citizens choose*, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S. Ct. 371, 386–87, 76 L. Ed. 747, 771 (1932) (Brandeis, J., dissenting) (emphasis added).  The problem with lab experiments performed by the judiciary is that the citizens have not chosen them.  And if they do not work out, it is difficult to pull the plug on them.  This does not mean that Iowa judges should hesitate to follow their sworn duty to uphold the Iowa Constitution, but they should not be deviating from federal constitutional precedent simply to promote what the concurrence calls "cross-fertilization" or "vertical federalism."

restraint. That was the approach taken by this court until three years ago. I think it was a good one.

### III. The Consent Issue.

Be that as it may, we did leave open several questions in *Ochoa*. For one thing, the search in that case was conducted by the police without the involvement of a parole officer. *Ochoa*, 792 N.W.2d at 262. And there was no particularized suspicion of criminal activity or a parole violation. *Id.* at 263. In addition to leaving open those matters, *id.* at 291, we also did not decide whether the parolee could be bound by an agreement consenting in advance to such a search. *Id.* This case presents all of those circumstances. However, my colleagues choose only to address one of them—the enforceability of a consent.

My colleagues could have decided the consent question by applying the well-developed body of federal constitutional law starting with *Schneckloth v. Bustamonte.* *See* 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *see also Samson*, 547 U.S. at 852 n.3, 126 S. Ct. at 2199 n.3, 165 L. Ed. 2d at 259 n.3 (leaving this question undecided). This might have led them to the same result. Unfortunately, rather than follow the well-established *Schneckloth* road, my colleagues have decided to bushwhack their own path under the Iowa Constitution. Thus, while they initially discuss *Schneckloth*, they then veer away from it and opt for a "practical" approach based on "contract law." Under this approach, the consent is deemed invalid because the prisoner has no "bargaining power": The prisoner's only choices are (1) to remain in prison and be subject to suspicionless searches or (2) to agree to be subject to suspicionless searches as a condition of leaving prison.

This syllogism sounds good if you say it quickly, but I think it falls apart on further analysis. If the prisoner is waiving a right that he or she

did not have before entering into the agreement, that should be more of a reason to *honor* the waiver.

Parole is a privilege. "There is no constitutional or inherent right to be conditionally released from prison prior to the expiration of a valid sentence." *State v. Cronkhite*, 613 N.W.2d 664, 667 (Iowa 2000). Thus, as a matter of fair bargaining and contract law, I do not understand why it is unfair for the state to insist upon the continued ability to conduct searches as part of the bargain. Indeed, by the majority's logic, virtually all the conditions of the parole agreement should be unenforceable, because these are *all* things the defendant cannot do while in prison (e.g., "I shall not change residence unless I receive approval," "I shall not associate with drug users," etc.).[52]

The Iowa Department of Corrections requires each inmate to sign a parole agreement before being paroled. Iowa Admin. Code r. 201—45.1(2) ("The parolee may not be released on parole prior to the execution of the parole agreement."). It is undisputed that the parole officer reviewed Baldon's parole agreement with him before he signed it. We should be encouraging the use of these parole agreements, not discouraging them. Contracts where a convicted felon such as Baldon agrees in writing to certain rules and expectations are an important part of the rehabilitative process.

In short, the majority's contract-based analysis is backward: It would be more appropriate to invalidate the contract if the state used the

---

[52]The majority more or less concedes in a footnote that this is a correct reading of its opinion. In other words, a parole agreement is a waste of time because none of it is enforceable. However, my colleagues leave open the possibility that other parole conditions might be valid, not because the parolee agreed to them, but because the State *ordered* them and they are "reasonable." While I think such caveats are helpful, they do not afford the predictability needed in this area.

benefits of parole to extract a concession that the prisoner did not otherwise have to give. By the same token, like the *Samson* majority, I find it easier to uphold a warrantless search of a parolee than a probationer because parole is more akin to imprisonment than probation is to imprisonment and because a parolee is coming from prison. *See* 547 U.S. at 850, 126 S. Ct. at 2198, 165 L. Ed. 2d at 258. My colleagues' reasoning is on the wrong track here as well.

One could argue that the right to be free from warrantless, suspicionless searches and seizures in the outside world is so important that it cannot be waived in advance, even by prisoners. At times, the majority hints at that approach, saying, "As a mandatory term of parole, such consent would also have the effect of justifying the search on the basis of parole status. This is not permitted under *Ochoa*." The majority also refers to giving article I, section 8 its "integrity," a somewhat amorphous concept that seems to suggest the right is not waivable. I would not agree with that view, but at least it would be a logical way to defend the result reached by the majority in this case. The majority's wholesale rejection of parole agreements and misapplication of contract law, however, leave me baffled.

Most states to have confronted the question have upheld the validity of parole agreements in which the parolee consents in advance to warrantless searches. *See McFerrin v. State*, 42 S.W.3d 529, 534–35 (Ark. 2001) ("[W]e have held that a parolee's advance consent is valid because the parolee remains in the custody of the penal institution from which he is released . . . ."); *State v. Devore*, 2 P.3d 153, 156 (Idaho Ct. App. 2000) ("The 'reasonable grounds' requirement for warrantless searches by probation or parole officers does not apply when the subject of the search has entered into a probation or parole agreement that

includes a consent to warrantless searches."); *People v. Wilson*, 885 N.E.2d 1033, 1042 (Ill. 2008) (upholding an agreement where the parolee consents in advance to warrantless searches); *Sullivan v. Bunting*, 975 N.E.2d 999, 1001 (Ohio 2012) (per curiam) (upholding the search of a parolee's email based on his prior consent to warrantless searches); *see also Roman v. State*, 570 P.2d 1235, 1241–42 (Alaska 1977) ("Depending on the nature of the crime involved, a condition of release granting authorities the right to search premises and persons at reasonable times could stand muster under both the Alaska and federal Constitutions."); William E. Ringel, *Searches and Seizures, Arrests and Confessions* § 17:8 (2012) ("In most jurisdictions, one of the conditions in [parole] agreements is that the parolee or probationer consents to the search of himself, his possessions, and his residence by a parole officer, and a majority of courts give effect to such provisions.").

The consent to search in the standard IDOC parole agreement is broad and authorizes searches "without . . . reasonable cause" and by any "law enforcement officer." In some states, this permission has been judicially narrowed. *See State v. Heaton*, 812 N.W.2d 904, 906, 909 (Minn. Ct. App. 2012) (holding a parole agreement provision that "[t]he offender will submit at any time to an unannounced visit and/or search of the offender's person, vehicle or premises by the agent/designee" justifies a search so long as reasonable suspicion exists); *Commonwealth v. Hughes*, 836 A.2d 893, 899 (Pa. 2003) (finding that a search pursuant to a parole agreement is permissible when "(1) the parole officer had reasonable suspicion to believe that the parolee committed a parole violation; and (2) the search was reasonably related to the duty of the parole officer"); *State v. Velasquez*, 672 P.2d 1254, 1260 (Utah 1983) (holding that notwithstanding an agreement, the state still must have

reasonable grounds for investigating whether a parolee has violated the terms of parole or committed a crime); *Pena v. State*, 792 P.2d 1352, 1356–58 (Wyo. 1990) (adopting Utah's approach).

If that approach were followed here, the search would still be upheld. Baldon was violating the terms of his parole by staying at the Traveler Motel, a known hotbed of drug and weapons violations. Yet the majority's sweeping approach does not allow for this outcome, either. Although the majority purports to apply contract law, it disregards the tenet that when a contract is unconscionable, the court may simply "limit the application of any unconscionable term as to avoid any unconscionable result." Restatement (Second) of Contracts § 208, at 107 (1981).

The majority's approach, I fear, will discourage the granting of parole to inmates who deserve it. Corrections officials need to be confident that they can detect and deter recidivism. The majority's rule raises the costs of detecting and deterring recidivism by telling the State if it releases a convicted drug dealer, it may not be able to do a parole check on that dealer if he chooses to stay at a motel that is a drug haven instead of being at the residence where he is supposed to be.[53]

Also, parole agreements—like other agreements—have the advantage of predictability. The majority's approach, by contrast, turns law enforcement into legal guesswork. In this case and *Pals*, my colleagues have made it clear that Iowa will not follow the established federal constitutional standards for when a consent to search is

---

[53]As my colleagues note in their majority opinion, this very point has been made by the late Professor William Stuntz. William J. Stuntz, *Implicit Bargains, Government Power, and the Fourth Amendment*, 44 Stan. L. Rev. 553, 580–81 (1992).

voluntary. But they have failed to articulate a coherent theory of voluntariness to replace it.[54]

*Pals* involved a brief and amicable encounter between a police officer and an individual whom he had pulled over for having a dog at large. Both the majority and the dissent on the court of appeals agreed that the consent to search of the vehicle was voluntarily given. *See State v. Pals*, No. 09–0064, 2010 WL 447322, at *5 (Iowa Ct. App. Feb. 10, 2010) (majority opinion) (stating that "the circumstances as a whole leave no doubt that his consent was voluntary"); *id.* at *8 (Doyle, J., dissenting) ("I agree that . . . Wubben's request for consent to search the truck was completely devoid of any coercion, undue pressure, or threats, and that Pals's consent was voluntary"). Yet this court reversed on the voluntariness of the consent, emphasizing a variety of procedural circumstances, including the fact that the individual had not been given specific advice that he could refuse to consent. *Pals*, 805 N.W.2d at 782–83.

Here the court can hardly fault the *procedures* under which consent was given—a written agreement was reviewed with Baldon before he signed it. So it focuses on "disproportionate bargaining power," because if the prisoner does not sign the agreement, he or she has to remain in prison. Thus, the court purports to apply an unconscionability analysis derived from contract law. But if we consider my colleagues' reasoning, it would seem to invalidate as involuntary many plea bargains. Doesn't the State have the same "disproportionate

---

[54]The concurrence pats this court on its back for doing the "hard work" of "[d]eveloping a meaningful independent state constitutional analysis" instead of "simply match[ing] our constitutional cases against federal precedents." I respectfully disagree. In my view, it is harder to work within an existing, well-developed line of authority, as courts generally do, than to branch off on one's own on an ad hoc basis.

bargaining power" when it has caught a criminal red-handed and offers him or her the opportunity to avoid many years in prison through a plea bargain?

Again, I could understand (although I would disagree with) the notion that the right to be free from suspicionless searches of a home, motel, or car is so important that it cannot be waived in an advance by a prisoner. Arguably, *Ochoa* foreshadowed such a result. A straightforward *Schneckloth* analysis might also support the majority's conclusion. But the majority's ill-conceived venture into contract law, I fear, will only lead to more uncertainty and undesirable consequences in other areas of criminal law.

### IV. The Specifics of This Case.

Even if one were inclined to invalidate some warrantless searches of parolees, this would not be the case to do so. Baldon's parole officer was present and both authorized and supervised the search. Moreover, at the time the search of Baldon's car occurred, it was already known that he was in violation of his parole agreement. Indeed, he was staying at a motel (that prohibited minors) with a school-age girl. In short, as I have already noted, this case presents two additional justifications for a parole search—the presence of the parole officer and the existence of reasonable suspicion or at least a clear parole violation. *See United States v. Knights*, 534 U.S. 112, 122, 122 S. Ct. 587, 593, 151 L. Ed. 2d 497, 507 (2001) (holding unanimously that a warrantless search of a probationer's apartment that was supported by reasonable suspicion and authorized as a condition of his probation was reasonable within the meaning of the Fourth Amendment); *Griffin v. Wisconsin*, 483 U.S. 868, 880, 107 S. Ct. 3164, 3172, 97 L. Ed. 2d 709, 721–22 (1987) (holding that the special needs of Wisconsin's probation system justified a

warrantless search of a probationer by probation officers pursuant to a Wisconsin regulation that allowed probation searches based on reasonable grounds).

Unfortunately, the majority plays a bit of gotcha, finding that the State has waived any basis other than consent for upholding the search. This strikes me as unfair to the State. When this case was heard in the district court, we had not decided *Ochoa*. Baldon's motion to suppress argued the parole agreement was unenforceable under both the United States and Iowa Constitutions, but Baldon did *not* urge a separate interpretation of the search and seizure clause in the Iowa Constitution. Not surprisingly, the trial court denied Baldon's motion to suppress on the authority of *Samson* and the court of appeals decision in *Ochoa* (which had relied on *Samson* to uphold the parole search). Given the defendant's failure to advance a separate state constitutional argument against the enforceability of the consent, and *Samson*'s status as a binding interpretation of federal constitutional law, the State presumably believed that it did not need to make a separate "reasonableness" or "special needs" argument below.

Now our *Ochoa* decision and today's decisions have changed the landscape. Baldon is being granted relief under a separate state constitutional argument he never made below. Yet we deny to the State the opportunity to go back to the district court and try to defend the search under our remade case law. Why?

It should be noted that Baldon himself does not object to our considering whether the search of the car was justified based on the presence of the parole officer or the existence of individualized suspicion. To the contrary, he briefed those issues in his opening brief. He logically, and I believe correctly, assumed those issues were still in play.

For the foregoing reasons, I respectfully dissent.

Waterman, J., joins this dissent.